**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| TASTY CHICK'N, LLC, *et al.*,[1] | § | Case No. 26-90831 (CML) |
| | § | |
| Debtors. | § | (Joint Administration Requested) |

**DECLARATION OF DANIEL MOSES IN SUPPORT OF DEBTORS' EMERGENCY MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO (A) OBTAIN POSTPETITION FINANCING AND (B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS, (III) GRANTING ADEQUATE PROTECTION, (IV) MODIFYING THE AUTOMATIC STAY, (V) SCHEDULING A FINAL HEARING, AND (VI) GRANTING RELATED RELIEF**

Daniel Moses declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:

1. I am a Partner of Province, LLC ("Province"), the proposed financial advisor to Tasty Chick'n, LLC and each of the other above-captioned affiliated debtors and debtors in possession (each, a "Debtor" and collectively, the "Debtors").

2. I am over the age of 18, and I am authorized to submit this declaration (this "Declaration") in support of the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting*

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/TastyChickn. The Debtors' address for service in these chapter 11 cases is Tasty Restaurant Group, 6201 W Plano Parkway, Suite 200, Plano, TX 75093.

*Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief* (the "Motion"), filed contemporaneously herewith.[2]

**Background and Qualifications**

3. Province is a leading corporate restructuring firm that is internationally recognized for providing a broad suite of services, including corporate advisory, institutional creditor advisory, litigation services, trust and liquidation services, and performance improvement services across a broad range of industries. Province and its professionals have extensive experience in the restructuring of distressed companies both in and out of court.

4. I personally have 25 years of experience as a financial advisor and investor specializing in recapitalization and restructuring transactions. Throughout my career, I have advised debtors, creditors, equity holders, and other constituents on a wide variety of restructuring transactions across a broad range of industries. In addition, I have extensive experience investing in distressed situations in the United States and Europe, including being named as Institutional Investor magazine's #1-ranked distressed analyst in North America on multiple occasions.

5. I joined Province on March 18, 2020, and serve as Head of Institutional Business, Capital Markets and Board Advisory. My representative engagements at Province include financial advisor to the special committee of the board of managers of Intelsat Envision Holdings LLC; financial advisor to the investigations committee of the board of directors of GWG Holdings, Inc.; financial advisor to the secured noteholders of Guitar Center Holdings, Inc.; financial advisor to the disinterested directors of the board of directors of Nordic Aviation Capital A/S; financial advisor to the second lien lenders in Sequential Brands Group, Inc.; financial advisor to the official equity committee of Washington Prime Group Inc.; financial advisor to the first lien ABL lenders

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion or the Interim DIP Order, as applicable.

in Murray Energy Corporation; financial advisor to Spacelink Corporation; financial advisor to the board of directors of Paratus Energy Services Ltd.; financial advisor to Cash Cloud, Inc.; financial advisor to the first lien lenders of Checkers Holdings Inc.; financial advisor to the company in View Homes; and financial advisor to the special committees in Sunnova Energy Corp., WeWork Cos., Careismatic Brands, and Ascend Performance, among others.

6. Prior to joining Province in 2020, I was Managing Principal and Chief Investment Officer of Pacific Creek Capital Advisors, LLC from 2012 to 2020. From 2007 to 2010, I served in various distressed investment roles at Partner Fund Management (PFM), Texas Pacific Group (TPG), and Longacre Fund Management. From 2000 to 2007, I was a Director in Donaldson, Lufkin & Jenrette/Credit Suisse's distressed group. From 1997 to 2000, I was an Associate at Lazard Ltd. I received a Bachelor of Arts degree in American Studies, magna cum laude, from Amherst College in 1996.

7. In my capacity as financial advisor to the Debtors, I am familiar with the Debtors' business and financial affairs, liquidity needs, and financing options. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' officers, employees, or retained advisors.

8. Pursuant to the Motion, the Debtors seek authority to, among other things: (a) enter into a secured, superpriority priming debtor-in-possession multi-draw term loan facility in an aggregate principal amount of up to $20,000,000.00 (the "DIP Facility") with MidCap Financial Trust and/or one or more of its affiliates ("MidCap" or the "DIP Lender") on the terms set forth in the DIP term sheet attached to the Interim DIP Order as Exhibit 1 (the "DIP Term Sheet"), consisting of (i) $5,000,000.00 in New Money DIP Loans, with up to $2,500,000.00 plus any Permitted Variance available upon entry of the Interim Order (the "Interim Draw") and the balance



4921-0471-8813

of $2,500,000.00 to be funded based upon draw requests consistent with an approved budget (the "Final Draw"), and (ii) effective upon entry of the Final Order and funding of the Final Draw, the substitution and exchange of up to three times the amount of New Money DIP Loans borrowed under the DIP Facility (up to $15,000,000.00) of the Debtors' prepetition principal obligations under the existing Credit and Guaranty Agreement dated May 16, 2024, among the Borrowers, MidCap, as administrative agent and lender, and the other lenders party thereto (the "Existing Credit Facility") for term loans under the DIP Facility (the "Roll-Up DIP Loans"); (b) use Cash Collateral under the terms of the DIP Orders; and (c) grant adequate protection to the Prepetition Lenders.

9. Based on the Debtors' financial condition, the Debtors were unable to obtain unsecured credit. The Motion therefore seeks authority to grant the DIP Lender superpriority administrative expense claims and liens on encumbered and unencumbered assets, as necessary to induce the DIP Lender to provide the DIP Facility. The DIP Liens granted under section 364(d)(1) of the Bankruptcy Code will prime the Prepetition Liens securing the Existing Credit Facility, but will be junior to Permitted Liens, subject in each case to the Carve-Out; MidCap, as the Debtors' prepetition lender, has consented to priming its own liens.

10. It is my opinion, based on my experience, that the proposed DIP Facility is the product of arm's-length, good-faith negotiations. The Debtors have approved the proposed transaction, and the Debtors and the DIP Lender were each represented by separate, independent advisors throughout the negotiation process. Accordingly, the DIP Facility represents the best postpetition financing available to the Debtors under the circumstances, and entering into the DIP Facility is in the best interests of the Debtors, their estates, and all parties in interest.

11. References to the Bankruptcy Code (as defined in the Motion), the chapter 11 process, and related legal matters are based on my understanding of such matters as explained to me by counsel. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

**The Debtors' Immediate Need for DIP Financing**

12. The Debtors' business history, capital structure, and circumstances leading to these chapter 11 cases are described in greater detail in the First Day Declaration, which is incorporated herein by reference.

13. Without additional financing, the Debtors would be unable to maintain payroll, satisfy critical operating obligations, pay rent and insurance, or fund the professional expenses necessary to implement a restructuring process.

14. The DIP Facility is critical to preserving value, maintaining operations and relationships with employees, vendors, franchisors, and counterparties, administering these chapter 11 cases, and effectuating the transactions contemplated by the Debtors.

15. Absent access to the DIP Facility and Cash Collateral, the Debtors would face immediate and irreparable harm. The Debtors do not have any sources of readily available credit other than the proposed DIP Facility. The Debtors would likely be unable to continue operations, resulting in a significant loss of estate value and materially diminished recoveries for creditors and other stakeholders. The DIP Facility therefore provides critically needed liquidity that will enable the Debtors to preserve going-concern value.

16. The Debtors have prepared a budget, attached hereto as **Exhibit A** (the "Approved Budget"), demonstrating their liquidity needs during the interim period. The Interim Draw of up to $2,500,000.00, plus any Permitted Variance, consists solely of New Money DIP Loans and is

tailored to cover the Debtors' projected operating expenses, professional fees, and administrative costs during the period between the interim and final hearings. The Roll-Up DIP Loans become effective only upon entry of the Final Order and funding of the Final Draw.

17. The Debtors' projected cash position is insufficient to sustain operations through the period required to conduct a final hearing on the Motion. Without immediate access to interim financing and Cash Collateral, the Debtors would be unable to fund payroll, satisfy vendor obligations, and pay the professional fees necessary to administer these chapter 11 cases, which would result in immediate and irreparable harm to the estates and their stakeholders. Interim approval is therefore necessary to bridge the Debtors' liquidity needs until the Court can conduct a final hearing.

**Debtors' Efforts to Obtain Financing**

18. Province explored financing options to address the Debtors' liquidity constraints and contacted 18 potential financing sources for a DIP loan, including the Debtors' franchisor, KFC. Currently, no other parties, including KFC, have been willing to extend unsecured credit, take a junior lien on any assets, or provide a priming DIP loan on more favorable terms than the MidCap DIP loan.

19. MidCap is the administrative agent and a lender under the Existing Credit Facility, and the obligations under the Existing Credit Facility are secured by substantially all of the assets of the Debtors, including all general intangibles. Obtaining postpetition financing from any other source was unrealistic, as it would have required the Prepetition Lenders to consent to priming liens or required financing on an effectively unsecured basis. No other stakeholder or third party has presented an alternative debtor-in-possession financing proposal. Between the interim and

final hearings, I plan to work with the Debtors and third parties to further market the DIP Facility to ensure the Debtors obtain postpetition financing on the best possible terms.

20. With no other source of capital available, the DIP Lender agreed to fund the DIP Facility. Given time and liquidity constraints, I believe that the DIP Facility is the best financing alternative available under the circumstances.

**Roll-Up Structure**

21. The DIP Facility consists of $5,000,000.00 in New Money DIP Loans and up to $15,000,000.00 in Roll-Up DIP Loans. Effective upon entry of the Final Order and funding of the Final Draw, the Roll-Up DIP Loans will substitute and exchange up to three times the amount of New Money DIP Loans borrowed under the DIP Facility of the Debtors' prepetition principal obligations under the Existing Credit Facility for term loans under the DIP Facility. No Roll-Up DIP Loans are sought on an interim basis.

22. The Roll-Up DIP Loans were a material and required component of the DIP Facility, and I do not believe the DIP Lender would be willing to provide the DIP Facility without them. The Debtors agreed to the roll-up structure only after arm's-length negotiations and because the DIP Lender was the sole viable source of financing.

23. In my experience, roll-up loans are not uncommon in chapter 11 cases, particularly where, as here, the Debtors are unable to locate a new, third-party lender willing to finance the chapter 11 process. Although ratios vary from case to case, the ratio of Roll-Up DIP Loans ($15,000,000.00) to New Money DIP Loans ($5,000,000.00) in this case is 3:1.

24. In my business judgment, the roll-up is reasonable under the circumstances, necessary to secure the DIP financing, and in the best interests of the Debtors' estates and stakeholders.

**Fairness and Reasonableness of the DIP Facility**

25. I believe the terms of the DIP Facility are fair and reasonable under the circumstances, are generally in line with market terms, and are the product of good-faith, arm's-length negotiations. The terms of the DIP Facility, including the interest rate, fees, Milestones, collateral package, and roll-up provisions, were negotiated by the Debtors and the DIP Lender with the assistance of experienced restructuring professionals and counsel.

26. The DIP Facility bears interest at fourteen percent (14%) per annum and, upon any Termination Event, at the lesser of (i) sixteen percent (16%) per annum and (ii) the maximum rate allowable under applicable non-bankruptcy law, payable monthly in arrears by capitalizing accrued interest, with the first monthly capitalization date being December 1, 2026. The DIP Facility also includes a Commitment Fee of 1% of the New Money DIP Loans, fully earned upon entry of the Interim Order, and an Exit Fee equal to 1% of the New Money DIP Loans. The DIP Loans mature on the earliest of, among other things, February 12, 2027, the failure to obtain approval of the Final Order on or before December 11, 2026, and the closing of a sale of all or substantially all of the Debtors' assets, and the Interim Draw is conditioned upon entry of the Interim Order on or before November 17, 2026. The specific terms of the DIP Facility are set forth in the DIP Term Sheet attached to the Motion.

27. I believe that the proposed DIP Liens on encumbered and unencumbered assets are common features of postpetition financing facilities and are a necessary feature here to provide security for the proposed financing.

28. Given the Debtors' financial condition, the limited availability of financing sources, and the timing and risks associated with these chapter 11 cases, I believe that the economic terms

of the DIP Facility are fair, reasonable, and appropriate under the circumstances and are in accordance with current market terms.

29. The DIP Facility provides the Debtors with sufficient liquidity to operate their businesses, preserve value, conduct a sale and/or restructuring process, and maximize recoveries for stakeholders.

30. I also believe that the Milestones contained in the DIP Facility are achievable and appropriately designed to facilitate a prompt and value-maximizing chapter 11 process.

31. After considering all available alternatives and consulting with the Debtors' advisors, I believe that entering into the DIP Facility, including the fees and rates to be paid, constitutes a sound exercise of the Debtors' business judgment and is in the best interests of the Debtors, their estates, and all stakeholders.

**Use of Cash Collateral**

32. In addition to the DIP Facility, the Debtors require continued use of Cash Collateral, which is essential to the continued operation of the Debtors' businesses and smooth entry into these chapter 11 cases.

33. The projections in the Approved Budget assume that the Debtors will continue to access cash generated through ordinary course transactions, and the Debtors would require further postpetition financing if they were unable to access Cash Collateral. Under the DIP Term Sheet, Cash Collateral will not be used to pay any expenses not described in the Approved Budget without the consent of the DIP Lender, and disbursements may not exceed the Approved Budget by more than the Permitted Variance of 15% on a cumulative aggregate basis.

34. Accordingly, I believe that access to Cash Collateral, on an interim basis, is critical to supplement the proceeds of the DIP Facility and provide the required liquidity for the Debtors to maintain ordinary course operations and administer these chapter 11 cases.

35. To protect the interests of the Prepetition Lenders, the DIP Orders provide adequate protection, solely to the extent of diminution in the value of the Prepetition Lenders' interests in their collateral, in the form of a claim having priority over any and all expenses of the kind specified in, among other sections of the Bankruptcy Code, sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, and 1114, subordinate only to those of the DIP Lender and the Carve-Out, together with the Debtors' stipulations, acknowledgments, and releases with respect to the Existing Credit Facility. Absent such protection, the Debtors' use of Cash Collateral and the granting of DIP Liens could result in a diminution in the value of the Prepetition Lenders' collateral. I believe these adequate protection provisions are sufficient to protect the Prepetition Lenders against any such diminution.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Dated: November 16, 2026

*<u>/s/ Daniel Moses</u>*
Daniel Moses
Province, LLC



4921-0471-8813

**<u>Exhibit A</u>**

**Approved Budget**

**Tasty Chick'n LLC et al. - DIP Financing Budget**

| | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | Forecast | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week #** | **1** | **2** | **3** | **4** | **5** | **6** | **7** | **8** | **9** | **10** | **11** | **12** | **13** | **14** | **15** | **16** | **17** | **18** | **Total** |
| **Start Date ->** | **7-Nov** | **14-Nov** | **21-Nov** | **28-Nov** | **5-Dec** | **12-Dec** | **19-Dec** | **26-Dec** | **2-Jan** | **9-Jan** | **16-Jan** | **23-Jan** | **30-Jan** | **6-Feb** | **13-Feb** | **20-Feb** | **27-Feb** | **6-Mar** | **7-Nov** |
| **End Date ->** | **13-Nov** | **20-Nov** | **27-Nov** | **4-Dec** | **11-Dec** | **18-Dec** | **25-Dec** | **1-Jan** | **8-Jan** | **15-Jan** | **22-Jan** | **29-Jan** | **5-Feb** | **12-Feb** | **19-Feb** | **26-Feb** | **5-Mar** | **12-Mar** | **12-Mar** |
| **Operating Receipts** | | | | | | | | | | | | | | | | | | | |
| Operating Cash Receipts | $ 2,489,258 | $ 2,489,258 | $ 2,310,075 | $ 2,310,075 | $ 2,214,185 | $ 2,214,185 | $ 2,214,185 | $ 2,008,112 | $ 1,874,397 | $ 1,874,397 | $ 1,874,397 | $ 1,874,397 | $ 2,026,943 | $ 2,026,943 | $ - | $ - | $ - | $ - | $ 29,800,809 |
| **Total Receipts** | **$ 2,489,258** | **$ 2,489,258** | **$ 2,310,075** | **$ 2,310,075** | **$ 2,214,185** | **$ 2,214,185** | **$ 2,214,185** | **$ 2,008,112** | **$ 1,874,397** | **$ 1,874,397** | **$ 1,874,397** | **$ 1,874,397** | **$ 2,026,943** | **$ 2,026,943** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 29,800,809** |
| **Operating Disbursements** | | | | | | | | | | | | | | | | | | | |
| Food & Packaging Costs | $ 735,847 | $ 735,847 | $ 681,617 | $ 681,617 | $ 606,436 | $ 606,436 | $ 606,436 | $ 543,002 | $ 540,896 | $ 540,896 | $ 540,896 | $ 540,896 | $ 564,889 | $ 564,889 | $ 200,000 | $ - | $ - | $ - | $ 8,690,599 |
| Payroll | - | 1,187,629 | - | 1,178,138 | - | 1,129,234 | - | 1,076,686 | - | 974,686 | - | 974,686 | - | 1,054,010 | 527,005 | - | - | - | 8,102,076 |
| Rent & Utilities | 73,853 | 874,708 | 66,424 | 883,468 | 90,494 | 90,494 | 90,494 | 77,490 | 801,135 | 71,296 | 71,296 | 71,296 | 803,335 | 73,496 | 90,000 | - | - | - | 4,229,278 |
| Insurance | 55,800 | 160,000 | 55,800 | 120,076 | 293,248 | 160,000 | 55,800 | 166,307 | 140,701 | - | 172,640 | - | 140,701 | - | 172,640 | - | - | - | 1,693,713 |
| Taxes | 205,295 | 233,877 | 202,622 | 287,131 | 184,717 | 184,717 | 213,299 | 223,541 | 169,393 | 157,943 | 231,525 | 169,797 | 179,968 | 168,518 | - | - | - | - | 2,812,340 |
| Payments to Franchisor | - | - | - | - | - | 1,296,799 | - | - | - | 947,368 | - | - | - | - | 829,754 | - | - | - | 3,073,921 |
| Payments to Manager | 131,250 | 131,250 | 117,287 | 117,287 | 117,287 | 117,287 | 117,287 | 103,324 | 103,324 | 103,324 | - | - | - | - | - | - | - | - | 1,158,910 |
| Credit Card and Bank Fees | 36,536 | 29,536 | 24,626 | 24,626 | 33,604 | 26,604 | 23,604 | 21,407 | 19,982 | 32,982 | 19,982 | 19,982 | 21,608 | 31,608 | 3,000 | - | - | - | 369,686 |
| Other Operating Disbursements | 202,500 | 282,500 | 202,500 | 202,500 | 202,500 | 273,989 | 202,500 | 202,500 | 202,500 | 265,479 | 202,500 | 202,500 | 202,500 | 202,500 | 80,000 | - | - | - | 3,129,468 |
| **Total Operating Disbursements** | **$ 1,441,081** | **$ 3,635,347** | **$ 1,350,876** | **$ 3,494,844** | **$ 1,528,285** | **$ 3,885,560** | **$ 1,309,419** | **$ 2,414,258** | **$ 1,977,931** | **$ 3,093,974** | **$ 1,238,838** | **$ 1,979,157** | **$ 1,913,000** | **$ 2,095,021** | **$ 1,902,399** | **$ -** | **$ -** | **$ -** | **$ 33,259,991** |
| **Operating Cash Flow** | **$ 1,048,177** | **$ (1,146,089)** | **$ 959,199** | **$ (1,184,769)** | **$ 685,900** | **$ (1,671,375)** | **$ 904,766** | **$ (406,145)** | **$ (103,534)** | **$ (1,219,577)** | **$ 635,559** | **$ (104,760)** | **$ 113,943** | **$ (68,078)** | **$ (1,902,399)** | **$ -** | **$ -** | **$ -** | **$ (3,459,182)** |
| **Non-Operating Receipts** | | | | | | | | | | | | | | | | | | | |
| Escrowed Proceeds / Other Receipts | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,472,209 | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ - | $ 1,472,209 |
| Sale Proceeds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Non-Operating Receipts** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 1,472,209** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ -** | **$ 1,472,209** |
| **Non-Operating Disbursements** | | | | | | | | | | | | | | | | | | | |
| Maintenance CapEx | $ 8,905 | $ 8,905 | $ 7,958 | $ 7,958 | $ 7,958 | $ 7,958 | $ 7,958 | $ 7,011 | $ 7,011 | $ 7,011 | $ 7,011 | $ 7,011 | $ 7,011 | $ 7,011 | $ - | $ - | $ - | $ - | $ 106,674 |
| Closure Costs | - | 195,000 | - | - | - | - | 150,000 | - | - | - | - | - | - | - | - | - | - | - | 345,000 |
| Professional Fees & Utility Escrow | - | 749,000 | 649,000 | - | 649,000 | - | 649,000 | - | 324,500 | - | 324,500 | - | - | - | - | - | - | - | 3,345,000 |
| UST Fees | - | - | - | - | - | - | - | - | - | 201,093 | - | - | - | - | - | - | - | 119,131 | 320,224 |
| **Total Non-Operating Disbursements** | **$ 8,905** | **$ 952,905** | **$ 656,958** | **$ 7,958** | **$ 656,958** | **$ 7,958** | **$ 806,958** | **$ 7,011** | **$ 331,511** | **$ 208,104** | **$ 331,511** | **$ 7,011** | **$ 7,011** | **$ 7,011** | **$ -** | **$ -** | **$ -** | **$ 119,131** | **$ 4,116,898** |
| **Net Cash Flow** | **$ 1,039,272** | **$ (2,098,994)** | **$ 302,241** | **$ (1,192,727)** | **$ 28,942** | **$ (1,679,333)** | **$ 97,808** | **$ (413,156)** | **$ (435,044)** | **$ 44,528** | **$ 304,048** | **$ (111,771)** | **$ 106,933** | **$ (75,088)** | **$ (1,902,399)** | **$ -** | **$ -** | **$ (119,131)** | **$ (6,103,871)** |
| **Cash Roll-Forward** | | | | | | | | | | | | | | | | | | | |
| Starting Cash Balance | $ 1,900,000 | $ 2,939,272 | $ 3,140,278 | $ 3,442,519 | $ 2,249,793 | $ 2,278,734 | $ 1,599,401 | $ 1,697,209 | $ 2,034,054 | $ 1,599,009 | $ 1,643,537 | $ 1,947,585 | $ 1,835,815 | $ 1,942,747 | $ 1,867,659 | $ 300,000 | $ 300,000 | $ 300,000 | $ 1,900,000 |
| (+ / -) Net Cash Flow | 1,039,272 | (2,098,994) | 302,241 | (1,192,727) | 28,942 | (1,679,333) | 97,808 | (413,156) | (435,044) | 44,528 | 304,048 | (111,771) | 106,933 | (75,088) | (1,902,399) | - | - | (119,131) | (6,103,871) |
| (+) DIP Facility Draw | - | 2,300,000 | - | - | - | 1,000,000 | - | 750,000 | - | - | - | - | - | - | 334,740 | - | - | - | 4,384,740 |
| (-) DIP Facility Paydown | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (180,869) | (180,869) |
| **Ending Cash Balance** | **$ 2,939,272** | **$ 3,140,278** | **$ 3,442,519** | **$ 2,249,793** | **$ 2,278,734** | **$ 1,599,401** | **$ 1,697,209** | **$ 2,034,054** | **$ 1,599,009** | **$ 1,643,537** | **$ 1,947,585** | **$ 1,835,815** | **$ 1,942,747** | **$ 1,867,659** | **$ 300,000** | **$ 300,000** | **$ 300,000** | **$ -** | **$ -** |

| | |
|---|---|
| **Gross DIP Facility Funding** | **$ 4,384,740** |
| **Net DIP Facility Funding** | **4,203,871** |

**Notes:**
- Does not reflect potential post-closing transition services agreement.
- Release of the escrowed $1.472M to the Debtors will be subject to further discussions and agreements.
- Accrued real and personal property taxes for purchased stores anticipated to be offset against a sale purchase price. During the pendency of the case the Debtor will continue to pay ordinary course real and personal property taxes.
- Accrued sales and use taxes anticipated to be offset against purchase price. During the pendency of the case the Debtors will continue to pay ordinary course sales and use taxes.
- Assumes Debtors file with 93 locations, but 84 go-forward stores subject to lease rejection motion. 10 additional stores would be rejected as of 12/24, thereby having 74 stores post-December 2026.
- Assumes post-petition payments made to KFC and Taco Bell, subject to lease rejections.
- Rent paid on all operating stores.
- Assumes post-petition payments made to Manager for November and December fees and final month administrative Manager fees to be offset against a sale purchase price.
- Half of February rent should be a credit against purchase price.
- Assumes November stub rent paid in first week of case.

**Tasty Chick'n LLC et al. - Professional Fee Build**

| Firm | $ Amt. |
|---|---|
| Province | $ 1,075,000 |
| Peak Franchise Capital / Guide Boat | 50,000 |
| Gray Reed | 1,225,000 |
| LNBY&G | 225,000 |
| Epiq | 450,000 |
| Lender Counsel - KRCL | - |
| Lender Counsel - Snell & Wilmer | - |
| UCC - Counsel | 150,000 |
| UCC - FA | 70,000 |
| **Total - Hourly Professional Fees** | **$ 3,245,000** |

*Note: Doesn't include $100K utility deposit or US Trustee fees*