**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| TASTY CHICK'N, LLC, *et al.*,[1] | § | Case No. 26-90831 (CML) |
| Debtors. | § | (Joint Administration Requested) |

**DECLARATION OF THOMAS M. SCOTT, PRESIDENT AND CEO,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

THOMAS M. SCOTT declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, as follows:[2]

1. I am the president and chief executive officer of Tasty Chick'n, LLC, Tasty Chick'n Southeast, LLC, and Tasty Chick'n Midwest, LLC and sole manager of VRE Tasty 7 Pack, LLC, the above-captioned debtors and debtors in possession. I have served as president and CEO since 2021. I have over 29 years of direct investing, consulting, advisory, and operational experience across a broad range of industries, including over 8 years of investment and operational experience within the quick-service segment of the restaurant industry.

2. As president and CEO, I am responsible for overseeing the operations and financial activities of the Debtors, including monitoring cash flow, business relationships, workforce issues, and financial planning. As a result of my tenure with the Debtors, my review of public and non-public documents, and my discussions with other members of the Debtors' management team, I

[1] A complete list of each of the Debtors in these chapter 11 cases and the last four digits of their tax identification numbers may be obtained on the website of the Debtors' proposed claims and noticing agent at https://dm.epiq11.com/TastyChickn. The Debtors' address for service in these chapter 11 cases is Tasty Restaurant Group, 6201 W Plano Parkway, Suite 200, Plano, TX 75093.

[2] Capitalized terms used but not immediately defined have the meanings given to them later in this Declaration.

am generally familiar with the Debtors' businesses, financial condition, policies and procedures, day-to-day operations, and books and records.

3. Except as otherwise noted, I have personal knowledge of the matters set forth herein or have gained knowledge of such matters from the Debtors' employees or retained advisors that report to me in the ordinary course of my responsibilities. I am over the age of 18, and I am authorized to submit this declaration on behalf of the Debtors. If called upon to testify, I would testify competently to the facts set forth in this declaration.

4. On the date hereof (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"), with this Court. To minimize the adverse effects on their businesses, the Debtors have filed several motions seeking various types of "first day" relief (collectively, the "First Day Motions"). I submit this declaration (this "Declaration") to assist the Court and parties in interest in understanding the circumstances resulting in the commencement of these chapter 11 cases, and in support of the Debtors' chapter 11 petitions and the First Day Motions.

## Preliminary Statement

5. The Operating Debtors currently own and/or operate 84 KFC and KFC/Taco Bell co-branded Restaurants under Franchise Agreements with the Yum! Parties. Revenue has declined significantly since the Operating Debtors acquired the Restaurants (as explained below), while food, labor, operating, and rent costs have increased, resulting in deteriorating Restaurant-level EBITDA. Additionally, the Franchise Agreements impose substantial remodel and upgrade obligations. These pressures have all led to more than $15.6 million in unpaid Royalties and, on September 15, 2026, the Yum! Parties provided the Operating Debtors with a notice of intent to terminate the Franchise Agreements. Termination of the Franchise Agreements would end the Operating Debtors' right to operate the Restaurants under the KFC and Taco Bell brands, constitute

an event of default under the Credit Agreement, and eliminate the going-concern value of the business.

6. The Debtors filed these chapter 11 cases to preserve the going-concern value of the Restaurants and to conduct a Court-supervised sale of their assets. At the same time, the Debtors will explore other stand-alone restructuring alternatives.

7. To familiarize the Court with the Debtors, their business, the circumstances leading up to these chapter 11 cases, and the relief the Debtors are seeking in the First Day Motions, this Declaration is organized into four parts. **Part I** provides background information on the Debtors' corporate structure, history, and operations. **Part II** describes the Debtors' prepetition capital structure. **Part III** describes the circumstances leading to the filing of these chapter 11 cases and the Debtors' restructuring efforts. **Part IV** summarizes the relief requested in, and the factual basis supporting, the First Day Motions.

## Part I
## Background

### A. History and Corporate Structure of the Debtors

8. Debtors Tasty Chick'n, LLC ("Tasty Chick'n"), Tasty Chick'n Southeast, LLC ("Southeast"), and Tasty Chick'n Midwest, LLC ("Midwest" and, collectively with Tasty Chick'n and Southeast, the "Operating Debtors") were formed in 2021 to develop, acquire, own, and operate KFC and Taco Bell branded restaurants pursuant to franchise agreements with KFC and Taco Bell and an overarching relationship agreement with the Yum! Parties.

9. Debtor VRE Tasty 7 Pack, LLC ("7 Pack" and together with the Operating Debtors, the "Debtors") was formed in 2024 to acquire real estate underlying KFC branded restaurants.

10. Tasty Chick'n is owned by non-debtor Tasty Brands II, LP ("Tasty Brands II"), which is also its managing member. Tasty Fund Manager II, LLC ("Fund Manager") is the general

partner of Tasty Brands II. Tasty Restaurant Group, LLC ("TRG"), a management company, is a non-debtor that provides various management services to the Operating Debtors.

11. As illustrated in the organizational chart attached hereto as **Exhibit A**, Tasty Chick'n is the sole member and manager of, and owns 100% of the interests in, each of Southeast and Midwest. Tasty Chick'n also owns 7 Pack and non-debtor TC Propco, LLC.[3] Southeast is the parent of non-debtor TCSE, LLC, and Midwest is the parent of non-debtor TCMW, LLC.

12. In addition to my role as president and CEO, I am also the sole manager of 7 Pack. Blake Overall is the Executive Vice President of Finance and Accounting.[4]

**B. The Debtors' Business**

13. As of the Petition Date, the Operating Debtors own and/or operate 84 restaurants (collectively, the "Restaurants"), consisting of 75 KFC and 9 KFC/Taco Bell co-branded restaurants. The Restaurants are located in 10 states across the following five geographic markets:[5]




[3] Non-debtor Verdad Real Estate Inc. originally owned 50% of 7 Pack along with Tasty Chick'n. Tasty Chick'n acquired Verdad's interest in 7 Pack and now owns 100% of the entity.

[4] Neither Thomas M. Scott nor Blake Overall is an employee of the Operating Debtors.

[5] The Restaurants are located in Tennessee, Florida, Virginia, Arkansas, Kentucky, Illinois, Missouri, Alabama, Mississippi, and Indiana.

14. In 2024, 7 Pack acquired a real estate portfolio of property underlying seven KFC restaurants. 7 Pack has since sold all of its properties except for certain real estate in Cave City, Kentucky. 7 Pack has no other assets or operations.

**C. Management Services Agreement with Tasty Restaurant Group**

15. The Debtors do not maintain the standalone administrative and support infrastructure necessary to operate the business. Rather, non-debtor TRG provides management services to the Debtors with respect to operations oversight, finance, risk management, acquisitions and acquisition integration, construction and asset management, and real estate. TRG provides these services pursuant to a Management Services Agreement dated as of December 22, 2021, between TRG and Tasty Chick'n (the "MSA").[6]

16. Pursuant to the MSA, TRG provides direction and oversight to the Debtors for day-to-day management, finance and accounting, vendor management, IT services, property management, risk management, site selection, marketing, and general administrative services, along with other similar services as may be agreed to by the parties (collectively, the "MSA Services"), including the following:

a. Management Oversight: TRG designates and is responsible for a brand officer who manages and oversees all operations of the Debtors (the "Brand Officer"). All field management other than the Brand Officer is the responsibility of the Debtors but is directly managed by TRG.

b. Human Resources: TRG provides human resources and employee relations management and oversight, including payroll.

c. Accounting, Tax, and Records: TRG provides general administrative services, including accounting and tax preparation, maintains all books and records with respect to the Debtors' transactions, and renders periodic and special reports as the Debtors reasonably request.

[6] The Debtors directly employ store-level employees and above-store field leadership.

17. In exchange for the MSA Services, the Debtors pay TRG a monthly management fee, in arrears, equal to 3% of the Debtors' gross revenue (the "Management Fee"). Additionally, the MSA requires the Debtors to reimburse TRG for certain operating costs and expenses that TRG pays on the Debtors' behalf, including (a) corporate governance expenses; (b) payments to certain third-party vendors; (c) certain human resources and employee related expenses; (d) taxes and registration fees; (e) insurance premiums; and (f) IT related costs.

18. Currently, the Debtors pay only 1% of the Management Fee in cash. The remaining 2% is subordinated to the obligations owed to the Prepetition Lenders and continues to accrue on the Debtors' books. Furthermore, the Operating Debtors may not amend, terminate, or otherwise modify the MSA in a manner adverse to the Prepetition Lenders.

19. The MSA has no fixed term and continues until terminated. TRG may terminate the MSA upon thirty (30) days' prior written notice. Tasty Chick'n may also terminate the MSA upon 30 days' prior written notice following a Capital Event (defined in the MSA as a sale, merger, public offering, change of control, or other liquidity event) involving Tasty Chick'n or its assets. Upon a Capital Event (as defined in the MSA), Tasty Chick'n must pay TRG a one-time termination fee equal to six times the monthly Management Fee for the last completed calendar month, prorated in the case of a partial asset sale.

**D. History of the Franchise Relationship**

20. The Operating Debtors operate the Restaurants pursuant to various franchise and license agreements (each, a "Franchise Agreement" and, collectively, the "Franchise Agreements"). The franchisor for the Operating Debtors' KFC branded Restaurants is KFC US, LLC ("KFC"). The franchisors for the Operating Debtors' co-branded KFC/Taco Bell Restaurants are KFC and Taco Bell Franchisor, LLC ("Taco Bell" and, together with KFC, the "Yum! Parties"). The Yum! Parties and the Operating Debtors are also parties to that certain Relationship Agreement

dated as of December 22, 2021 (as amended, the "Relationship Agreement").[7] The Relationship Agreement remains in effect until every Franchise Agreement has terminated, with termination dates ranging from December 31, 2026 to May 30, 2044. In addition to the Relationship Agreement and the Franchise Agreements, Midwest and Southeast each entered into Advertising Agreements, dated December 23, 2021 (the "Advertising Agreements") with KFC National Council and Advertising Cooperative, Inc. (the "Cooperative"). The Relationship Agreement, the Franchise Agreements, and the Advertising Agreements govern the Operating Debtors' relationship with the Yum! Parties.

21. The Operating Debtors acquired a substantial portion of their Restaurants and the related Franchise Agreements through two acquisitions. First, on December 22, 2021, Tasty Chick'n acquired 90 KFC and KFC/Taco Bell franchised restaurants located in Alabama, Arkansas, Florida, Illinois, Kentucky, Mississippi, Missouri, and Tennessee from Fowler Foods, Inc. and certain affiliated sellers (the "Fowler Acquisition"). As part of the Fowler Acquisition, the Yum! Parties consented to the transfer of the sellers' rights and obligations under the applicable Franchise Agreements to Southeast and Midwest.

22. Second, on May 16, 2024, Tasty Chick'n acquired 64 KFC and KFC/Taco Bell restaurants located in Florida, Illinois, Indiana, Kentucky, Missouri, Tennessee, and Virginia from JRN, Inc. ("JRN") and certain affiliated sellers (the "JRN Acquisition"). As part of the JRN Acquisition, the Yum! Parties consented to the transfer of the rights and obligations under the applicable Franchise Agreements to Southeast and Midwest.

---

[7] The parties to the Relationship Agreement are the Yum! Parties, Midwest, Southeast, Tasty Chick'n, Tasty Brands II, Fund Manager, TRG, and certain other non-Debtors.

**E. The Franchise Agreements**

23. While the Relationship Agreement governs the overall franchise relationship between the Operating Debtors and the Yum! Parties, each Restaurant has its own Franchise Agreement, under which KFC or Taco Bell, as applicable, grants a license to use and operate under the KFC brand or, for co-branded Restaurants, the KFC and Taco Bell brands. Each Franchise Agreement generally has a 20-year term and may be extended for successive 10-year periods by agreement of the parties. As franchisees, the Operating Debtors are responsible for maintaining and upgrading each Restaurant in accordance with the uniform national standards of KFC and, for co-branded Restaurants, KFC and Taco Bell.

24. Under the Franchise Agreements, the Operating Debtors owe (i) a franchise fee of 4.3% to 5.7% of each Restaurant's net revenues, (ii) national advertising fees of approximately 5.6% of net revenues, and (iii) certain other fees, including digital/technology fees, rent-related fees, and KFC Foundation fees (collectively, the "Royalties"). Tasty Brands II Blocker, LP, Fund Manager, and Tasty Brands II, each a non-debtor affiliate, guarantee the Operating Debtors' obligations under the Relationship Agreement (the "Franchise Guaranties"). Under the Advertising Agreements, each of Southeast and Midwest is a member of the Cooperative for use of advertising materials in the KFC Restaurants. These Operating Debtors are obligated to pay the Cooperative for merchandising, point-of-purchase, menu board, and similar materials through the KFC system uniform merchandising program, in addition to monthly advertising fees based on the prior month's sales. The Advertising Agreements remain in effect for as long as the Franchise Agreements are in effect.

**F. Defaults Under the Relationship Agreement and Franchise Agreements**

25. On December 17, 2025, the Yum! Parties sent the Operating Debtors a notice of breaches and defaults under the Relationship Agreement, the Franchise Agreements, and the

Franchise Guaranties (the "Original Default Notice"), and demanded payment of all past due amounts and cure of all existing defaults. The Yum! Parties, the Operating Debtors, and the guarantors under the Franchise Guaranties engaged in discussions regarding a forbearance arrangement but were unable to reach agreement.

26. On September 15, 2026, the Yum! Parties sent the Operating Debtors a Notice of Intent to Terminate (the "Notice of Intent to Terminate"). The Notice of Intent to Terminate asserts that the Operating Debtors owe $15,684,849.71 in Royalties to the Yum! Parties, exclusive of late fees, as follows: (i) $5,631,291.10 in royalties; (ii) $7,862,088.37 in advertising contributions; (iii) $1,606,878.99 in digital/technology fees; (iv) $417,117.86 in rent-related fees; and (v) $169,660.89 in KFC Foundation fees.

27. The Yum! Parties also asserted, upon information and belief, that a material breach of the Relationship Agreement has occurred relating to financial reporting. The Yum! Parties asserted that, if the alleged defaults are not timely cured, they would exercise their option to terminate the Franchise Agreements and pursue other remedies, including under the Franchise Guaranties.

28. For over a year before the Petition Date, and before the Yum! Parties sent the Notice of Intent to Terminate, the Debtors were working with both MidCap and the Yum! Parties to address the Debtors' liquidity and business issues. These efforts were redoubled in the weeks leading up to the Petition Date in an attempt to achieve either a consensual out-of-court restructuring or a consensual chapter 11 process. Unfortunately, the parties were unable to reach a global resolution, leaving the Debtors caught between MidCap and the Yum! Parties. The Debtors remain hopeful that, as these chapter 11 cases progress, the parties will be able to agree upon a consensual restructuring that maximizes value for all stakeholders.

## Part II
## Prepetition Capital Structure

### A. Acquisition Loans

29. To partially finance the Fowler Acquisition, the Operating Debtors entered into that certain Loan and Guaranty Agreement with Chris Fowler and Mark Fowler, as lenders, dated December 22, 2021 (the "Fowler Acquisition Loan"). The Fowler Acquisition Loan was secured by liens on substantially all of the Operating Debtors' personal property. The Fowler Acquisition Loan was repaid in full in 2022 through a term loan with Western Alliance.

30. In connection with the JRN Acquisition, Tasty Chick'n issued an unsecured Subordinated Promissory Note dated May 16, 2024, in the principal amount of $5,000,000 in favor of JRN (the "JRN Note"). The JRN Note is subordinated to the obligations under the Credit Agreement. Approximately $5,000,000 in principal remains outstanding on the JRN Note.

### B. Prepetition Loan Structure with MidCap

31. The Operating Debtors are borrowers under that certain Credit and Guaranty Agreement dated May 16, 2024 (the "Credit Agreement") with MidCap Financial Trust, as administrative agent and lender ("MidCap"), and MidCap Financial Investment Corporation, MidCap Funding Franchise Finance Trust, MidCap Funding VI Trust, and Athora Lux Invest NL, as lenders (together with MidCap, the "Prepetition Lenders").

32. The Credit Agreement provides for three facilities: (1) a term loan in the original principal amount of $58,000,000 (the "Term Loan A"), repayable in monthly installments of $48,333.33;[8] (2) a development line of credit with an aggregate commitment of $30,000,000, available through May 16, 2027 (the "DLOC Loan"); and (3) a revolving credit facility with an

[8] Approximately $25,000,000.00 of the Term Loan A proceeds were used to pay off the term loan with Western Alliance, which was used to pay off the remaining amount owed on the Fowler Acquisition Loan; the balance of Term Loan A was used to finance the JRN Acquisition.

aggregate commitment of $10,000,000, including a $10,000,000 letter of credit limit (the "LC Loan" and together with Term Loan A and the DLOC Loan, the "Prepetition Loans").

33. The proceeds of the DLOC Loan may be used, among other things, to finance up to 80% of the (i) project costs of developing new KFC-approved restaurant sites and remodeling existing sites and (ii) costs of acquiring existing operating restaurants of a permitted concept. DLOC Loan proceeds may not be used for ongoing site operations, royalty payments, or marketing expenses. The proceeds of the LC Loan may be used to issue letters of credit for the benefit of the Yum! Parties or their affiliates or designees supporting franchise fees, royalties, and other obligations owed to them. Indeed, on May 16, 2024, MidCap issued an irrevocable standby letter of credit in favor of Taco Bell, as beneficiary, for Tasty Chick'n in the total amount of $871,000.00.

34. Term Loan A matures on May 16, 2029; the DLOC Loan and LC Loan commitments expire on the same date. The Prepetition Loans bear interest at (i) the Term SOFR Rate (as defined in the Credit Agreement, and subject to a 1.00% floor) plus an applicable margin of 5.75% to 6.25%, or (ii) for an applicable Base Rate Loan (as defined in the Credit Agreement), a base rate plus an applicable margin of 4.75% to 5.25%, based on the Operating Debtors' ratio of total debt to consolidated EBITDA. Based on the foregoing, the Prepetition Loans currently bear interest at approximately 10.02%. The Prepetition Loans bear default interest at an additional 2.0% per annum.

35. The Credit Agreement obligations are secured by that certain Security and Pledge Agreement dated as of May 16, 2024, whereby the Operating Debtors granted a continuing security interest in substantially all of their personal property, including accounts, cash, deposit accounts, equipment, inventory, general intangibles, intellectual property, contracts, investment property,

pledged debt, insurance, and proceeds of the foregoing. The Debtors believe the Prepetition Lenders' security interests have been properly perfected.

36. Tasty Chick'n, Midwest, and Southeast are jointly and severally liable for the payment and performance of all obligations under the Credit Agreement. The Credit Agreement further provides that each present and future direct or indirect subsidiary of Tasty Chick'n, other than a borrower with respect to its own obligations and any excluded subsidiary, has jointly and severally guaranteed all obligations under the Credit Agreement. However, none of the Operating Debtors' subsidiaries, including 7 Pack, is a party to the Credit Agreement.

37. As of the Petition Date, the Operating Debtors are indebted to the Prepetition Lenders in the approximate amount of $67,217,658.46 in principal and accrued interest, plus additional costs and fees.

**C. Prepetition Loan Defaults**

38. Prior to the Petition Date, multiple Events of Default (as defined in the Credit Agreement) arose under Section 8.1(b) of the Credit Agreement as a result of the failure to comply with the financial covenants set forth in the Credit Agreement, and in September 2025 the Prepetition Lenders sent a Reservation of Rights Letter. Specifically, the alleged defaults included, among others, that the Operating Debtors breached (1) the Pre-Distribution Fixed Charge Coverage Ratio set forth in Section 6.1 of the Credit Agreement, (2) the Post-Distribution Fixed Charge Coverage Ratio set forth in Section 6.2 of the Credit Agreement, and (3) the Total Debt to Consolidated EBITDA Ratio set forth in Section 6.3 of the Credit Agreement.

**D. 7 Pack Loan Agreement**

39. To finance the acquisition of its real estate portfolio, 7 Pack entered into that certain Commercial Loan Agreement dated May 15, 2024, with The American National Bank of Texas, as lender ("7 Pack Lender"), and Tasty Chick'n, as guarantor (as modified and/or amended, the

"7 Pack Loan Agreement"). 7 Pack issued a Promissory Note in the original principal amount of $4,652,456.00 in favor of 7 Pack Lender (the "7 Pack Note"). The 7 Pack Note was secured by seven (7) first lien mortgages or deeds of trust on each piece of 7 Pack's real property (together with the 7 Pack Loan Agreement and the 7 Pack Note, the "7 Pack Loan Documents"). As 7 Pack sold off pieces of its real estate portfolio, the 7 Pack Loan Documents were modified to reduce the amount of outstanding principal and to release the liens on transferred property. The 7 Pack Loan Agreement matures on May 16, 2027, and bears interest at the lesser of the maximum non-usurious interest rate under applicable law and 6.80%.

40. As of the Petition Date, the outstanding amount owing under the 7 Pack Loan Agreement was $717,315.00.

**Part III**
**Circumstances Leading to These Chapter 11 Cases and Restructuring Efforts**

**A. Operational and Financial Pressures**

41. The Debtors' store-level profitability has been declining since 2023, beginning with falling sales. The Restaurants' sales fell 11.4% in fiscal year 2024, fell another 1.4% in fiscal year 2025, and have fallen 2.8% so far in fiscal year 2026. Taken together, sales at the Restaurants have declined by approximately 15.6% over this three-year period. As sales fell, the Debtors' costs rose. As a result, restaurant margins shrank from 11.8% in fiscal year 2023 to 4.0% so far in fiscal year 2026. Over the trailing twelve-month period of fiscal year 2026, store-level EBITDA declined from approximately $12.4 million for the comparable trailing twelve-month period in fiscal year 2025 to approximately $7.1 million. Over the same period, labor costs, operating expenses, and rent all increased.

42. The broader KFC system has also experienced decline. KFC's greater United States system sales declined 6.0 % in the third quarter of 2026, and net restaurant growth in the country

was negative 2.8% in the first half of 2026.[9] At the same time, the Operating Debtors face substantial capital requirements under the Franchise Agreements. Currently, approximately 37 Restaurants have substantial remodel, renewal-upgrade, or refresh obligations through 2029.

43. In response to these pressures, the Operating Debtors began deferring Royalty payments in mid-2025 and generally ceased paying Royalties starting in November 2025. Consequently, as of September 2026, the Operating Debtors had failed to pay more than $15.6 million in Royalties to the Yum! Parties, culminating in the Original Default Notice and the Notice of Intent to Terminate. Termination of the Franchise Agreements would end the Operating Debtors' right to operate the Restaurants under the KFC and Taco Bell brands and would constitute an event of default under the Credit Agreement. Because the Operating Debtors' business consists of operating franchised Restaurants, termination would eliminate the going-concern value of the business and the value that a buyer or the Prepetition Lenders could otherwise realize.

**B. Landlord and Other Litigation**

44. As of the Petition Date, the Debtors are defendants in approximately 14 real estate related actions pending in state and federal courts in Illinois, Florida, Kentucky, Tennessee, and Virginia (collectively, the "Landlord Actions").[10] Based on my review of the pleadings and my discussions with the Debtors' management and advisors, I understand that the Landlord Actions generally arise from the Debtors' nonpayment of rent and other charges under leases for Restaurant locations, including several locations that the Debtors closed or were in the process of closing before the Petition Date. The plaintiffs in the Landlord Actions seek, among other things, past-

[9] *See* https://www.qsrmagazine.com/story/kfcs-u-s-turnaround-has-a-long-way-to-go-as-international-business-surges/.

[10] At least one non-lease related lawsuit is pending against the Operating Debtors as of the Petition Date.

due rent, accelerated rent and other lease damages, attorneys' fees and costs, and possession of the leased premises.

45. The most significant Landlord Actions are: (a) a lease default action relating to the Robinson, Illinois location, Case No. 3:26-cv-00050-SPM, pending in the U.S. District Court for the Southern District of Illinois, in which the plaintiff seeks approximately $1,800,505.00 in damages; and (b) a lease default action relating to the Magnolia, Tennessee location, Case No. 3-183-26, pending in the Circuit Court of Knox County, Tennessee, in which the plaintiff seeks approximately $134,009.27 in damages. I understand that the aggregate amount asserted against the Debtors in the Landlord Actions exceeds approximately $2 million.

46. Several of the Landlord Actions relate to closed or winding-down locations subject to leases that the Debtors seek to reject or may seek to reject. Others relate to Restaurants that the Debtors continue to operate and that I believe may be important to preserving the going-concern value of the Debtors' business. Absent the protection of the automatic stay, the continued prosecution of the Landlord Actions would require the Debtors to divert limited cash and management time to defending multiple suits across several jurisdictions, could result in judgments for possession that would force the closure of operating Restaurants, and could trigger additional defaults under the Franchise Agreements and the Credit Agreement.

## C. Reasons for Filing the Chapter 11 Cases

47. The Debtors commenced these chapter 11 cases to address the defaults under the Relationship Agreement and the Franchise Agreements and the threatened termination of the Franchise Agreements. The automatic stay preserves the Franchise Agreements and the going-concern value of the Restaurants and halts the Landlord Actions. Chapter 11 also allows the Debtors to reject burdensome leases for closed and winding-down locations, complete the 7 Pack

sale described below, and conduct an orderly, Court-supervised sale process or plan transaction with the Prepetition Lenders for the benefit of their creditors and other stakeholders.

**D. 7 Pack Sale Transaction**

48. Prior to the Petition Date, 7 Pack entered into that certain Real Estate Sale Contract to sell its remaining parcel of real property located at 812 Mammoth Cave Street, Cave City, Kentucky, to Plaza Street Partners, LLC ("7 Pack Buyer") for $675,000.00. The Real Estate Sale Contract contemplates a 90-day due diligence period, followed by a 30-day closing period. 7 Pack intends to assume the Real Estate Sale Contract in connection with these chapter 11 cases. Because 7 Pack has no other assets or operations, the sale will convert its only remaining asset into cash, the proceeds of which will be applied toward the approximately $717,315.00 outstanding under the 7 Pack Loan Agreement.

**E. Restructuring Transactions**

49. As noted above, the Debtors commenced these chapter 11 cases to preserve the going-concern value of the Restaurants and to conduct a Court-supervised sale of substantially all of the Operating Debtors' assets under section 363 of the Bankruptcy Code. At the same time, the Debtors will explore other stand-alone restructuring alternatives.

50. Currently, the Operating Debtors are marketing the Restaurants either as an entire portfolio, by individual market, or in combinations of different markets to maximize buyer participation and transaction value.

51. Prior to the Petition Date, the Debtors engaged Guideboat Advisors and Peak Franchise Capital (together, "Guideboat") to market the Restaurants. Starting in July 2026, Guideboat conducted targeted outreach to potentially interested parties. Guideboat prepared a teaser and confidential information memorandum and, in October 2026, launched a formal sales process and broad marketing of the Operating Debtors' assets. The Operating Debtors intend to

seek Court approval of bidding procedures that will set deadlines for submitting bids, conducting an auction, and holding a sale hearing. The sale process or any stand-alone restructuring alternative will remain subject to Court approval and to any consents required under the Franchise Agreements.

## Part IV
## <u>First Day Motions</u>

### A. Evidentiary Support for First Day Motions.

52. Contemporaneously herewith, the Debtors have filed a number of First Day Motions and other pleadings seeking various forms of relief intended to stabilize their business operations, facilitate the efficient administration of these chapter 11 cases, and support an orderly restructuring. The First Day Motions include the following:

a. *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief*;

b. *Notice of Designation as Complex Chapter 11 Bankruptcy Case*;

c. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Serve a Consolidated List of Creditors and a Consolidated List of the 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases, (IV) Establishing a Master Service List, and (V) Granting Related Relief*;

d. *Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities, and Statements of Financial Affairs, and (II) Granting Related Relief*;

e. *Debtors' Emergency Application for Entry of an Order Authorizing the Retention and Employment of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent, Effective as of the Petition Date*;

f. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Insurance Policies and Honor All Obligations in Respect Thereof, (B) Renew, Supplement, and Enter into New Insurance Policies, and Pay Premiums Thereunder, (C) Maintain Their Surety Bond Program, and (D) Continue Their Premium Financing Agreements, and (II) Granting Related Relief*;

g. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief*;

h. *Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief*;

i. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief*;

j. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief.*

k. *Debtors' Emergency Motion for Entry of an Order (I) Authorizing (A) the Rejection of Certain Leases, (B) the Rejection of Certain Agreements, and (C) the Abandonment of Certain Property; and (II) Granting Related Relief*;

l. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue to Operate Their Cash Management System and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief*; and

m. *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (VI) Granting Related Relief.*[11]

A description of the relief requested in, and the facts supporting, each First Day Motion is set forth in **Exhibit B** attached hereto and incorporated herein by reference. I am familiar with the content of each First Day Motion and believe that the relief sought in each (a) is necessary to

[11] Additional support for this motion can be found in the *Declaration of Daniel Moses in Support of Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing, and (IV) Granting Related Relief* [Docket No. 17].

enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, (b) is critical to the Debtors' successful exit from these chapter 11 cases, (c) best serves the interests of the Debtors' estates and creditors, and (d) should be approved on an emergency basis to avoid immediate and irreparable harm to the Debtors.

I have reviewed each of the First Day Motions, and the facts set forth therein are true and correct to the best of my knowledge and belief and are incorporated herein in their entirety by reference. If asked to testify as to the facts supporting each of the First Day Motions, I would testify to the facts as set forth in such motions and **Exhibit B**.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Executed on November 16, 2026

*/s/ Thomas M. Scott*
Thomas M. Scott
President and CEO / Sole Manager

# Exhibit A

## Corporate Structure Chart

# Tasty Chick'n Corporate Structure

Debtor entities

Non-debtor entities



# <u>Exhibit B</u>

## Evidentiary Support for First Day Motions[1]

[1] Capitalized terms used but not defined herein have the meanings given to them in the applicable First Day Motion.

**A. *Debtors' Emergency Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief* (the "Joint Administration Motion")**

1. I believe the joint administration of these four (4) chapter 11 cases will provide significant administrative convenience without harming the substantive rights of any party in interest. Many, if not all, of the motions, hearings, and orders in these chapter 11 cases will affect each Debtor entity. Therefore, I believe that an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections. I also believe that joint administration will allow the Office of the U.S. Trustee for the Southern District of Texas (the "U.S. Trustee") and all parties in interest to monitor these chapter 11 cases with greater ease and efficiency. Moreover, because this motion seeks only administrative consolidation of the Debtors' estates, I do not believe that parties in interest will be harmed by the relief requested but instead will benefit from the cost reductions associated with the joint administration of these chapter 11 cases.

**B. *Notice of Designation of Complex Chapter 11 Bankruptcy Case* (the "Complex Case Designation")**

2. On November 16, 2026, the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code. It is my understanding that proposed counsel to the Debtors believe that these chapter 11 cases qualify as complex chapter 11 cases pursuant to this Court's *Procedures for Complex Cases in the Southern District of Texas* because (1) the total liabilities of the Debtors, along with the Debtors' non-filing affiliates, exceed $10 million and (2) there are more than fifty (50) parties in interest in these cases. Therefore, the Debtors have requested for these chapter 11 cases to be designated as complex chapter 11 cases.

***C. Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Serve a Consolidated List of Creditors and a Consolidated List of the 30 Largest Unsecured Creditors, (II) Authorizing the Debtors to Redact Certain Personal Identification Information, (III) Approving the Form and Manner of Notifying Creditors of the Commencement of the Debtors' Chapter 11 Cases, (IV) Establishing a Master Service List, and (V) Granting Related Relief*** **(the "Creditor Matrix Motion")**

3. Through the Creditor Matrix Motion, the Debtors request authority to file one consolidated Creditor Matrix for all the Debtors. It is my understanding that a large number of creditors may be shared amongst the Debtors; thus, I believe that the preparation of separate lists of creditors for each Debtor would be expensive, time consuming, and administratively burdensome. The Debtors also request authority to file a single, consolidated list of their 30 largest general unsecured creditors (the "Top 30 List"). Because a large number of creditors may be shared amongst the Debtors, I believe that the Top 30 List will help alleviate administrative burdens, costs, and the possibility of duplicative service.

4. The Debtors also request authority to redact certain personal identification information. With thousands of creditors and other parties in interest, the Debtors cannot reasonably know with sufficient certainty whether a release of each creditor's personal information could potentially jeopardize their safety. I believe that it is appropriate to redact from any documents filed or to be filed with the Court in these chapter 11 cases, including the Creditor Matrix, the home addresses of individuals, including those of the Debtors' creditors, employees, and former employees. I believe that the redaction of the home addresses and personally identifiable information of individuals in the Creditor Matrix is necessary to protect such individuals' privacy and from the undue risk of identity theft or injury.

5. Additionally, the Debtors request authority to establish notice procedures and a Master Service List. The Debtors anticipate there will be thousands of notice parties in these cases. The cost of photocopying and mailing routine pleadings to all potential creditors would be

substantial and unduly burdensome, particularly given that not all creditors and parties in interest need to be apprised of routine matters that do not affect their rights. I believe that the proposed notice procedures will afford due and adequate notice to all parties in interest without burdening the Debtors' estates with substantial administrative costs.

### *D. Debtors' Emergency Motion for Entry of an Order (I) Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs, and (II) Granting Related Relief* **(the "Schedules and Statements Extension Motion")**

6. Through the Schedules and Statements Extension Motion, the Debtors seek an extension of the deadline by which the Debtors must file their schedules of assets and liabilities, schedules of current income and expenditures, schedules of executory contracts and unexpired leases, and statements of financial affairs under the Bankruptcy Code (collectively, the "Schedules and Statements") by an additional fifteen (15) days from the Petition Date, through and including December 15, 2026. Completing the Schedules and Statements requires the Debtors and their advisors to spend considerable time and effort to collect, review, and assemble copious amounts of information in addition to attending to the daily demands of the chapter 11 process. I believe that the Debtors' requested extension is in the best interests of the Debtors' estates and parties in interest, as focusing the attention of key personnel and advisors on critical operational and chapter 11 compliance issues during the early days of these chapter 11 cases will facilitate the Debtors' smooth transition into chapter 11 and will ensure the Debtors' personnel have sufficient time to complete the Schedules and Statements.

***E. Debtors' Emergency Application for Entry of an Order Authorizing the Employment and Retention of Epiq Corporate Restructuring, LLC as Claims, Noticing, and Solicitation Agent, Effective as of the Petition Date*** **(the "Claims Agent Retention Application")**

7. The Debtors request authority to employ Epiq Corporate Restructuring, LLC ("Epiq") as their claims, noticing, and solicitation agent (the "Claims and Noticing Agent") in their chapter 11 cases, effective as of the Petition Date, in accordance with the terms and conditions of the engagement letter dated October 15, 2026 (the "Engagement Letter") entered into by and between the Debtors and Epiq. Epiq is a chapter 11 administrator comprised of leading industry professionals with significant experience in both the legal and administrative aspects of large, complex chapter 11 cases. I believe that Epiq's employment is in the best interest of the estates because Epiq's rates are competitive and reasonable given its quality of services and expertise. Although the Debtors have not yet filed their schedules of assets and liabilities, the Debtors anticipate that there will be thousands of persons and entities to be noticed and that many of these parties will file claims. Given the anticipated number of claimants and the complexity of the Debtors' businesses, I believe that appointing Epiq as Claims and Noticing Agent will provide the most effective means of noticing, administering claims-related tasks, and soliciting and tabulating votes on a chapter 11 plan, while relieving the administrative burden on the Debtors and the Office of the Clerk of the Bankruptcy Court. Accordingly, I believe that the appointment of Epiq as the Claims and Noticing Agent is in the best interests of both the Debtors' estates and their stakeholders.

F. ***Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Continue Their Insurance Policies and Honor All Obligations in Respect Thereof, (B) Renew, Supplement, and Enter into New Insurance Policies, and Pay Premiums Thereunder, (C) Maintain Their Surety Bond Program, and (D) Authorize Continuation of Premium Financing Agreements, and (II) Granting Related Relief* (the "Insurance Motion")**

8. The Debtors seek authority to continue insurance coverage entered into prepetition and satisfy obligations related thereto, renew, supplement, or purchase insurance coverage as needed postpetition, continue their surety bond program, and continue the terms of related premium financing agreements.

**I. The Insurance Policies**

9. In the ordinary course of business, the Debtors maintain or are additional insureds under approximately eleven (11) insurance policies (collectively, the "Insurance Policies") that are administered collectively as part of a program (the "Insurance Program") by various third-party insurance carriers (collectively, the "Insurance Carriers"). The Insurance Policies provide coverage for, among other things, commercial general liability (CGL), commercial crime, cyber, flood, automotive, property, and directors and officers liability. The Insurance Policies are essential to the ongoing operation of the Debtors' business enterprise and are required under the Debtors' franchise agreements. The Debtors also maintain workers' compensation and other insurance policies and for which relief is sought by a separate motion.[1]

10. The Insurance Policies are generally one year in length and typically renew in June every year. The insurance premiums for the policies are generally due annually in advance

[1] In addition to the Insurance Policies, the Debtors maintain numerous insurance policies with respect to, among other things, workers' compensation, employee health, dental, disability, and life insurance benefits. These policies are described, and relief is requested with respect to such policies, in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief*, filed contemporaneously herewith.

pursuant to the payment terms set forth in each applicable Insurance Policy. Currently, the aggregate annual premium that the Debtors pay for the Insurance Policies is approximately $1,332,308.59. As discussed further below, the Debtors finance those premiums pursuant to the Insurance Premium Financing Agreements.

11. As of the Petition Date, I do not believe that the Debtors have any prepetition amounts due or outstanding on account of insurance premiums. Out of an abundance of caution, however, the Debtors seek authority to pay any prepetition amounts due and owing on account of the insurance premiums and to continue honoring all payment obligations under the Insurance Policies in the ordinary course of business to ensure uninterrupted coverage thereunder. Additionally, the Debtors seek to maintain the Insurance Program or enter into new policies in the ordinary course of business postpetition.

12. Under certain Insurance Policies, the Debtors may be required to pay deductibles (the "Insurance Deductibles") or self-insured retentions ("SIRs") depending upon the type of claim and Insurance Policy involved. Generally, if a claim is made against the Insurance Policies that is subject to an Insurance Deductible, the applicable Insurance Carrier will administer the claim and make payments in connection therewith and then invoice the Debtors for any Insurance Deductibles. Insurance Policies with SIRs work in a similar fashion; however, the Debtors administer and pay the claim only up to the SIR amount. Once the payments meet the SIR amount, the Insurance Carrier will administer the claim and make any payments up to the Insurance Policy's limit.

13. The continuation of the Insurance Program, maintenance of the Insurance Policies, and entry into new insurance policies are essential to the preservation of the value of the Debtors' business enterprise. Moreover, in many instances, insurance coverage is required by the

regulations, laws, credit agreements, and contracts that govern the Debtors' commercial activities, including the requirement by the U.S. Trustee that a debtor maintain adequate coverage given the circumstances of its chapter 11 case. Accordingly, the Debtors seek authorization to maintain and/or modify their existing Insurance Policies, honor obligations related thereto, and enter into new insurance policies in the ordinary course of business and consistent with prepetition practices.

## II. The Debtors' Insurance Broker

14. The Debtors obtain Insurance Policies through Hub International Svs. Inc. (the "Broker"). The Broker, among other things, (a) assists the Debtors in obtaining comprehensive insurance coverage and bonds for the Debtors' operations in a cost-effective manner, (b) manages renewal data, (c) markets the Insurance Policies, (d) handles all interactions with carriers and sureties, including negotiating policy terms, provisions, and premiums, and (e) provides ongoing support throughout the applicable policy periods.

15. The Broker is paid an advisory fee of $510,000 for its services (the "Broker Fees"). The Broker Fees are reduced by any commissions the Broker receives directly from the Insurance Carriers. Such commissions are taken by the Broker upfront at policy renewal and credited against the overall Broker Fees, and the Broker then bills the remaining balance of the Broker Fees. As of the Petition Date, I do not believe the Debtors owe any unpaid prepetition obligations to the Broker. However, out of an abundance of caution, the Debtors seek authority to honor any amounts owed to the Broker in the ordinary course of business to ensure uninterrupted coverage under the Insurance Policies.

## III. The Debtors' Premium Financing Agreements

16. All of the Insurance Policies are financed through certain premium financing agreements, between Tasty Chick'n, LLC. as an insured party (the "Insured Party"), and FIRST

Insurance Funding, A Division of Lake Forest Bank & Trust Company, N.A. (the "Insurance Premium Financing Lender") (collectively, the "Insurance Premium Financing Agreements"). The obligations under the Insurance Premium Financing Agreements (the "Premium Financing Obligations") are secured by any and all unearned or return premiums and dividends that may become due under the policies purchased in connection with the applicable Insurance Premium Financing Agreements. Among the potential remedies available to the Insurance Premium Financing Lender for nonpayment is the ability to cancel the Insurance Policies and seek a refund of the insurance premiums it financed. I estimate that the Debtors' prepetition amount accrued and outstanding on account of the Premium Financing Obligations in the aggregate is approximately $619,298.32, of which approximately $122,072.75 is expected to be due and payable within thirty (30) days after the Petition Date. The Debtors seek authority to honor the existing Insurance Premium Financing Agreements and, as necessary, to pay any associated Premium Financing Obligations.

## IV. The Debtors' Surety Bond Program

17. In the ordinary course of operating their business, the Debtors maintain various surety bonds (collectively, the "Surety Bonds") to provide security for their various utility providers (the "Utility Providers") in lieu of cash deposits (the "Surety Bond Program"). Utility providers commonly require customers to post security, such as cash deposits, or other collateral, as a condition of providing service. The Surety Bonds satisfy those requirements, without requiring the Debtors to post cash. As a result, the Surety Bond Program allows the Debtors to preserve liquidity that would otherwise be held as cash security deposits, while still providing Utility Providers with adequate security for the Debtors' obligations. Absent the Surety Bond Program, I believe that the Debtors would likely be required to fund replacement cash deposits or

other collateral, diverting liquidity from operations at a time when the Debtors are working to stabilize their business and pursue their restructuring.

18. Liberty Mutual Insurance Co. (the "Surety") is the issuer of the Debtors' currently outstanding Surety Bonds. As of the Petition Date, the Debtors maintain approximately thirty-eight (38) Surety Bonds in an aggregate bond amount of approximately $528,520.84. The Debtors make annual premium payments to maintain the Surety Bond Program in the ordinary course of business and pay approximately $10,761.00 per year in surety premiums.

19. The Debtors must be able to continue to maintain the Surety Bond Program in the ordinary course of business, including by paying premiums and renewing, replacing, or obtaining new surety bonds as needed. If the Surety Bonds lapse or are not timely renewed or replaced, Utility Providers may demand cash deposits or other security, or may seek to discontinue service, either of which could disrupt the Debtors' operations and reduce the liquidity available to fund the Debtors' business and these chapter 11 cases. By contrast, the cost of maintaining the Surety Bond Program—approximately $10,761.00 per year in premiums—is modest relative to the security it provides. As of the Petition Date, I do not believe that the Debtors owe any amounts on account of the Surety Bonds. Out of an abundance of caution, however, the Debtors seek authority to honor any prepetition amounts that may be owed to the Surety to avoid any interruption of the Surety Bond Program.

### *G. Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Payment of Certain Prepetition and Postpetition Taxes and Fees and (II) Granting Related Relief* **(the "Taxes Motion")**

20. The Debtors collect, withhold, and incur certain sales and use taxes ("Sales and Use Taxes"), income taxes ("Income Taxes"), franchise taxes ("Franchise Taxes"), business license and other taxes and fees ("Business License and Other Taxes and Fees"), and property taxes

("Property Taxes") and fees (collectively, the "Taxes and Fees").[2] The Debtors collect (as applicable) and remit the Taxes and Fees to various federal, state, and local taxing authorities through checks and electronic funds transfers that are processed through their banks and other financial institutions.

21. The Debtors pay the Taxes and Fees to the Taxing Authorities on a periodic basis, remitting them monthly, quarterly, or annually depending on the nature, jurisdiction, and incurrence of a particular Tax or Fee. Through the Taxes Motion, the Debtors seek to pay approximately $6,400,799.78, representing certain unpaid Taxes and Fees which (a) accrued or were incurred prepetition and become due postpetition, (b) constitute "trust fund" taxes, and (c) are expected to arise or accrue postpetition in the ordinary course of business, consistent with prepetition practices.

22. The Taxes and Fees that I believe the Debtors owe as of the Petition Date are summarized as follows:

| **Category** | **Description** | **Approx. Amt. Paid by the Debtors in 2025** | **Approx. Amt. Accrued and Unpaid as of Petition Date** | **Approx. Amt. to Be Paid Through this Motion** |
|---|---|---|---|---|
| Federal Income | Federal income tax imposed on income earned in connection with the Debtors' enterprise, including the non-Debtor subsidiaries, that the Debtors pay on a consolidated basis. | $0.00 | $0.00 | $0.00 |
| Sales and Use Taxes | Taxes imposed on the sale and use of certain goods and services | $20,792,288.59 | $2,416,627.00 | $2,416,627.00 |
| Franchise Taxes | Franchise Taxes incurred by the Debtors in various states. | $100,469.00 | $0.00 | $0.00 |

[2] The Debtors do not seek authority, through the Taxes Motion, to collect and remit state and federal employee-related taxes and withholdings. Such relief is instead requested by separate motion.

| Category | Description | Approx. Amt. Paid by the Debtors in 2025 | Approx. Amt. Accrued and Unpaid as of Petition Date | Approx. Amt. to Be Paid Through this Motion |
|---|---|---|---|---|
| Property Taxes | Personal and real property taxes incurred by the Debtors in various states. | $1,699,801.27 | $4,073,268.45 | $395,714.00 |
| Business License and Other Taxes and Fees | Taxes and Fees paid to the Taxing Authorities for licensing, permitting, reporting, and similar regulatory compliance requirements. | $134,620.41 | $0.00 | $0.00 |
| | **Total** | | | **$2,812,341.00** |

## I. Income Taxes

23. The Debtors incur federal and state Income Taxes on the income earned as part of the Debtors' business enterprise. Federal Income Taxes are paid annually in arrears. I believe that, as of the Petition Date, the Debtors have no Federal Income Taxes outstanding, due to the Debtors' ability to offset income against net operating losses. Nevertheless, out of an abundance of caution, the Debtors seek authority to pay, in their discretion, any prepetition Income Taxes that become due postpetition and to continue paying Income Taxes in the ordinary course of business.

## II. Sales and Use Taxes

24. In the ordinary course of business, the Debtors incur, collect, and remit Sales and Use Taxes to the applicable Taxing Authorities in connection with the sale and purchase of goods and services. The Debtors purchase a variety of equipment, materials, and services necessary for the operation of their business from certain vendors who collect sales taxes in connection with the Debtors' purchase of such goods or services. The Debtors also incur use taxes for the purchase of such goods and services when vendors are not registered to collect or have not collected sales

taxes. In these chapter 11 cases, applicable law generally requires the Debtors to subsequently pay use taxes on such purchases to the applicable Taxing Authorities.

25. The Debtors also collect and remit Sales and Use Taxes each month in the ordinary course of their businesses. When such amounts are collected by the Debtors from the ultimate purchaser, they are held in trust. The Debtors paid approximately $20,792,288.59 in Sales and Use Taxes in the 2025 fiscal year.

26. In addition to monthly remittances for their current Sales and Use Taxes, the Debtors have five (5) Sales and Use Tax repayment plans with various state Taxing Authorities (the "Repayment Plans") for prior years' Sales and Use Taxes. The Repayment Plans are paid monthly, and the combined outstanding balance of the Repayment Plans is $870,569.13.

27. As of the Petition Date, I believe the Debtors owe an estimated $2,327,531.33 in accrued Sales and Use Taxes.[3] Accordingly, the Debtors seek authority to pay any Sales and Use Taxes that are due and owing as of the Petition Date, including outstanding prepetition amounts, and to continue paying Sales and Use Taxes in the ordinary course of business during these chapter 11 cases.

## III. Franchise Taxes

28. The Debtors are required to pay Franchise Taxes to certain states for the privilege of conducting business. Franchise Taxes are paid annually in arrears each April through the Debtors' reimbursement of Tasty Restaurant Group under the Management Services Agreement. I believe that, as of the Petition Date, the Debtors have no outstanding Franchise Taxes. Nevertheless, out of an abundance of caution, the Debtors seek authority, in their discretion, to pay

[3] The accrued Sales and Use Taxes amount includes the combined outstanding balance of the Repayment Plans.

any prepetition Franchise Taxes that become due postpetition and to continue paying Franchise Taxes in the ordinary course of business.

## IV. Property Taxes

29. State and local laws in the jurisdictions where the Debtors operate generally grant Taxing Authorities the power to levy Property Taxes against the Debtors' real and personal property. To avoid the imposition of statutory liens on their real and personal property, the Debtors typically pay Property Taxes on property that they own on an annual basis.

30. In 2025, the Debtors paid approximately $1,699,801.27 in Property Taxes to the applicable Taxing Authorities. As of the Petition Date, I believe the Debtors owe approximately $4,073,268.45 in accrued Property Taxes. Accordingly, the Debtors seek authority to pay any Property Taxes that are due and owing as of the Petition Date, including outstanding prepetition amounts, and to continue to pay Property Taxes as they come due in the ordinary course of business during these chapter 11 cases.

## V. Business License and Other Taxes and Fees

31. In the ordinary course of business, the Debtors incur certain regulatory assessments, permitting, licensing, and other operational taxes and fees, including fees related to certain regulations, and other miscellaneous taxes and fees. The Debtors generally remit the Business License and Other Taxes and Fees to the relevant Taxing Authorities on an annual, quarterly, or other periodic basis, depending on the specific Tax or Fee. In 2025, the Debtors paid approximately $134,620.41 in Business License and Other Taxes and Fees to the applicable Taxing Authorities.

32. I believe that, as of the Petition Date, the Debtors owe no outstanding amounts on account of the Business License and Other Taxes and Fees. Nevertheless, out of an abundance of

caution, the Debtors seek authority, in their discretion, to pay any prepetition Business License and Other Taxes and Fees that become due postpetition and to continue paying the Business License and Other Taxes and Fees as they come due in the ordinary course of business during these chapter 11 cases.

***H. Debtors' Emergency Motion for Entry of an Order (I) Approving the Debtors' Proposed Adequate Assurance of Payment for Future Utility Services, (II) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services, (III) Approving the Debtors' Proposed Procedures for Resolving Adequate Assurance Requests, and (IV) Granting Related Relief*** **(the "Utilities Motion")**

33. In connection with the operation of their business and management of their properties, the Debtors obtain electricity, natural gas, water, waste management, telecommunications, internet, cable, and other similar services (collectively, the "Utility Services") from various utility companies, municipalities, or brokers (each, a "Utility Company," and collectively, the "Utility Companies") to facilitate their business operations.

34. It is my understanding the Utility Services are essential for the Debtors to maintain and operate their business, which requires electricity, water, natural gas, telecommunications, and other Utility Services to transact business and safely provide food service to its customers. Should any Utility Company refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted.

35. The Debtors pay Utility Companies for the Utility Services either directly or through an agreement with Engie Insight Services Inc. ("Engie"), a utility management company. Engie receives, audits, processes, and pays certain of the Debtors' electric, gas, water, sewer, natural gas, and recycling and waste removal utilities. For those Utility Companies paid through Engie, Engie consolidates the utility bills and sends the Debtors a file with all expenses due on account of Utility Services. The amounts are then drawn out of the bank the following business

day for payment. The Debtors pay Engie a monthly service fee of approximately $3,600.00, and it is my understanding there is approximately $11,104.00 in outstanding fees owed to Engie as of the Petition Date. The Debtors also pay a number of Utility Companies directly, including Memphis Light, Gas and Water ("MLGW") and certain telecommunications providers.

36. Additionally, the Debtors maintain various surety bonds (the "Surety Bonds") to provide security for certain of the Utility Companies in lieu of cash deposits. Unlike other providers, where the customers post security, such as cash deposits or other collateral, as a condition of providing service, those requiring the Surety Bonds allow the Debtors to satisfy those requirements while still providing the Utility Companies with adequate security for the Debtors' obligations.

37. It is my understanding that, as of the Petition Date, the Debtors owe approximately $400,000.00[4] on account of prepetition Utility Services. On average, over the last four months, accounting for only those stores currently open and telecommunication providers, the Debtors paid approximately $400,000.00 each month for Utility Services,[5] with some fluctuations depending on the season. I estimate that, after rejecting certain leases contemplated in the *Debtors' Emergency Motion for Entry of an Order (I) Authorizing (A) the Rejection of Certain Leases, (B) the Rejection of Certain Agreements, and (C) the Abandonment of Certain Property, and (III) Granting Related Relief*, the Debtors' cost for Utility Services during the next 30 days will still be approximately $400,000.00 per month.

[4] This figure represents accounts payable for vendors which only provide utility services. There may be some other amounts owed to vendors or landlords which also include utility services, including rent for which water and sewer or other utilities are included.

[5] This amount includes both payments made directly to MLGW and those made through Engie.

38. The Debtors intend to pay postpetition obligations owed to the Utility Companies in a timely manner. Cash held by the Debtors, cash generated in the ordinary course of business, and cash made available to the Debtors under the proposed DIP loan facility will provide sufficient liquidity to pay the Debtors' Utility Service obligations for postpetition services. It is my understanding that each of the foregoing satisfies the requirements under section 366 of the Bankruptcy Code. Nonetheless, as additional adequate assurance, the Debtors propose to segregate $100,000.00 within the Debtors' existing cash management system (the "Adequate Assurance Deposit") within five (5) business days of this Court's entry of the Order. The Adequate Assurance Deposit represents an amount equal to approximately one-fourth of the Debtors' average monthly cost of Utility Services after the rejection of certain of the Debtors' stores. The Adequate Assurance Deposit will be held as segregated funds within the Debtors' existing cash management system for the duration of these chapter 11 cases, subject to the Debtors' right to terminate or discontinue the applicable Utility Services, and may be applied to any postpetition defaults in payment to the applicable Utility Companies.

39. Any Utility Company that is not satisfied with the Proposed Adequate Assurance may make a request for adequate assurance of future payment (each, an "Adequate Assurance Request") pursuant to the adequate assurance procedures set forth in the Order (the "Adequate Assurance Procedures"). The Adequate Assurance Procedures provide a streamlined process for Utility Companies to address potential concerns with respect to the Proposed Adequate Assurance, while allowing the Debtors to continue uninterrupted operations. Specifically, the Adequate Assurance Procedures permit a Utility Company to object to the Proposed Adequate Assurance by serving an Adequate Assurance Request upon certain notice parties. The Debtors, in their discretion, may then resolve any Adequate Assurance Request by

mutual agreement with the Utility Company and without further order of the Court. If the Debtors determine that the Adequate Assurance Request cannot be resolved by mutual agreement, the Debtors will seek Court resolution of the Adequate Assurance Request.

40. The Debtors have made a good-faith effort to identify all Utility Companies and include them on the Utility Services List. If the Debtors identify new or additional Utility Companies or discontinue services from existing Utility Companies, the Debtors seek authority, in their sole discretion, to amend the Utility Services List to add or remove parties from the Utility Services List, provided that the Debtors shall give notice of any such amendment to certain notice parties.

41. I believe that the relief requested in the Utilities Motion is necessary for the Debtors to operate their businesses in the ordinary course, maximize the value of their estates for the benefit of all stakeholders, and avoid immediate and irreparable harm. I believe that the proposed Adequate Assurance Procedures are fair and equitable, within the Debtors' sound business judgment, and reasonable.

### ***I. Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to (A) Pay Prepetition Wages, Salaries, Other Compensation, and Reimbursable Expenses and (B) Continue Employee Benefits Programs, and (II) Granting Related Relief* (the "Wages Motion")**

42. The Debtors operate KFC and combination KFC and Taco Bell restaurants in 10 states. The Debtors are dependent on their employees to continue to provide excellent service to their customer base and operate in the ordinary course. The payment of the Debtors' Workforce Obligations is vital to the Debtors' ability to reorganize and to the operation of the Debtors' enterprise.

43. As of the Petition Date, the Debtors employ approximately 1,646 employees.[6] Of those 1,646 employees, the Debtors employ 1,064 full-time hourly employees, 563 part-time hourly employees, and 19 salaried employees (the "Salaried Employees"). The vast majority of the Debtors' employees are paid hourly (the "Hourly Employees" and, together with the Salaried Employees, the "Employees").[7]

44. The Employees perform a wide variety of functions critical to the Debtors' business enterprise, to say nothing of the administration of these chapter 11 cases and the Debtors' restructuring. Without the continued, uninterrupted services of the Employees, the Debtors' business enterprise will halt, and the administration of the estates will be materially impaired.

45. Additionally, the Employees rely on compensation and benefits to pay their daily living expenses and other necessities. These individuals will experience significant hardship if the Court does not permit the Debtors to continue paying their compensation and providing them with health and other benefits. For these reasons, the Debtors respectfully submit that the relief requested herein is necessary and appropriate.

## I. Workforce Programs

46. In the ordinary course of business, the Debtors (a) pay standard wage compensation and paid time off, (b) maintain reimbursement programs, and (c) maintain certain other benefits for the workforce (collectively, the "Workforce Programs"), as provided below.

47. As of the Petition Date, the Debtors estimate the total amount outstanding on account of the Workforce Programs is approximately $1,501,940.79 (the "Workforce

[6] All of the Debtors' Employees are employed by Tasty Chick'n, LLC.

[7] The Debtors do not have any independent contractors.

Obligations"), all, or nearly all, of which (excluding accrued PTO Obligations) will become due and owing shortly after the Petition Date. The Workforce Obligations consist of the following:

| Workforce Obligations | Estimated Prepetition Amount Outstanding |
|---|---|
| **Compensation Obligations** | |
| Unpaid Wages | $366,163.67 |
| PTO Obligations (accrued but unpaid for active Employees) | $558,708.91[8] |
| Withholding Taxes and Obligations (i.e., Deductions) | $429,779.73 |
| ADP Payroll Processing Fees | $58,007.00 |
| Employee Reimbursements | $1,240.28 |
| Bonus Programs | $30,750.00 |
| **Total Compensation Obligations** | **$1,444,649.59** |
| **Benefits Obligations** | |
| Health Insurance (Medical, Vision, Dental Insurance) | $41,303.95 |
| Other Benefits (Life, Accidental and Critical Illness, Hospital Indemnity Insurance and disability benefits) | $599.58 |
| 401(k) Plan | $15,320.47 |
| Miscellaneous Employee Programs | $67.20 |
| Workers' Compensation Obligations | $0.00 |
| **Total Benefits Obligations** | **$57,291.20** |
| **TOTAL WORKFORCE OBLIGATIONS** | **$1,501,940.79** |

48. I believe there are no Employees who are owed prepetition amounts in excess of the $17,150 priority wage cap imposed by sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code, and the Debtors do not seek authority to pay any amount in excess of such cap through the Wages Motion.

49. Subject to the Court's approval of the relief requested herein, the Debtors intend to continue their Workforce Programs in the ordinary course of business and also seek the ability to modify, change, and discontinue any of the Workforce Programs and to implement new programs, policies, and benefits in the ordinary course of business during these chapter 11 cases and without the need for further Court approval, subject to applicable law.

[8] The Debtors do not seek to pay these PTO obligations through the Wages Motion. Rather, the Debtors seek the authority for the Employees to continue to use PTO accrued prior to the Petition Date in the ordinary course of business postpetition.

**a. Compensation, Withholding, and Expense Reimbursement**

i. **Wage Obligations**

50. The Employees are paid on a bi-weekly basis in arrears. The Employees are typically paid on the Wednesday of each respective payment period and, if a regularly scheduled payday coincides with a holiday, the Employees receive their paychecks on the business day preceding the holiday. The payroll for both the Hourly Employees and the Salaried Employees is funded and paid at the same time on a bi-weekly basis. Since the Employees are paid in arrears, they often have wages and other compensation that have accrued but are unpaid at any given point in time. As of the Petition Date, I estimate that the Debtors owe approximately $366,163.67 on account of accrued but unpaid wages to the Hourly and Salaried Employees. The Debtors seek authority to pay this amount postpetition and to continue honoring their payroll obligations to Employees in the ordinary course of business.

51. The Debtors' payroll processing functions for Employees are managed by ADP. I estimate that as of the Petition Date, the Debtors owe approximately $58,007.00 to ADP for its payroll processing services. The Debtors seek authority to pay this amount postpetition and to continue honoring their payroll processing obligations in the ordinary course of business during the administration of these chapter 11 cases.

ii. **Bonus Programs**

52. Certain Employees are entitled to earn bonuses (each, a "Bonus" and collectively, the "Bonuses"), through programs to be paid out to certain higher-level restaurant Employees, including district managers, restaurant general managers and assistant managers, and the directors of operations (each, a "Bonus Program," and collectively, the "Bonus Programs"). The Bonus Programs measure quarterly results and reward eligible Employees for meeting or exceeding budgeted sales and profits targets and for delivering top level performance. Approximately 44

Employees are eligible for the Bonuses through the Bonus Programs, and none of these eligible Employees are insiders of the Debtors as defined in the Bankruptcy Code. Bonuses are discretionary and paid out quarterly and in arrears. As of the Petition Date, I estimate that the Debtors owe approximately $30,750.00 in Bonuses that have accrued but remain unpaid under the Bonus Programs. The Debtors seek authority to pay such amounts and to continue the Bonus Programs in the ordinary course postpetition.

iii. **Reimbursable Expenses**

53. In the ordinary course of business, the Debtors maintain a reimbursement policy, whereby the Debtors reimburse certain Employees for a variety of ordinary, necessary, and reasonable expenses that the Employees incur within the scope of their job duties. These reimbursement expenses are paid through a platform provided by Comdata, Inc. ("Comdata"). Such reimbursable expenses may include, but are not limited to, the following: mileage costs, air or ground transportation expenses, lodging, meals related to the Debtors' business, and other expenses required by applicable laws. The Employees must follow the written company guidelines to be eligible for reimbursement. Employees pay the expenses eligible or approved for reimbursement with personal funds and submit requests for reimbursement of such expenses. Employees are expected to follow the written policy and use sound judgment when incurring business expenses for which they seek reimbursement. To be reimbursed, Employees report the expenses to Comdata and submit their receipts or relevant documents that substantiate the expenses to the Debtors for approval. As of the Petition Date, I estimate that the Debtors owe approximately $1,240.28 for accrued but unpaid reimbursable expenses to the Employees. The Debtors seek to pay such amount and to continue the expense reimbursements in the ordinary course of business.

iv. **Paid Time Off and Sick Leave**

54. The Employees are entitled to paid time off ("PTO"). PTO is earned on an accrual basis. Generally, one week of PTO may be carried over into the following year but any carryover expires in 12 months. Eligible Employees are also provided with paid sick leave, as required by state and/or local regulations. Employees may carry over accrued sick leave from one year to the next; however, the maximum accrual for eligible Employees is dependent on state regulations. I estimate that, as of the Petition Date, the Debtors owe approximately $558,708.91 in accrued and unpaid PTO for the Employees. The Debtors request authority to allow the Employees to use their accrued PTO amounts in the ordinary course of business. To be clear, the Debtors do not, through this Motion, seek authority to pay out any PTO obligations accrued before the Petition Date.

v. **Deductions**

55. In the ordinary course of business, ADP processes deductions from Employees' payroll in respect of federal, state, and local income taxes, FICA, court ordered garnishments, child support, and pre-tax deductions payable pursuant to certain of the health, welfare, and retirement savings programs detailed herein (collectively, the "Deductions"), and forwards those amounts to the various third-party entities on whose behalf the Deductions were made. Some Deductions are taken from each paycheck, while other Deductions are taken less frequently.

56. Approximately 1,087 of the Debtors' Employees also participate in HealthWorX, a supplemental employee health and wellness benefits program administered by a third party administrator. HealthWorX is an auto-enroll benefit for new hires.[9] The program is designed to provide the Employees with access to affordable healthcare services, including preventative care, primary care, telemedicine, and other wellness-related benefits. The program operates through a

[9] Eligible new hires are automatically enrolled and may waive the coverage within 60 days.

pre-tax payroll deduction arrangement under section 125 of the Internal Revenue Code combined with a subsidy provided through a nonprofit partner. Employees may opt out of the program, but participating Employees have a pre-tax deduction taken from their paycheck and receive a corresponding subsidy intended to offset the cost of coverage.[10]

57. As of the Petition Date, I estimate that the Debtors' aggregate amount of Deductions that have been taken but not yet paid to the appropriate recipient is approximately $429,779.73, consisting of approximately $264,762.58 for taxes, $22,818.62 for garnishments, $57,627.98 for Employee 401(k) contributions, and $84,570.55 for medical, benefits, and HealthWorX. The Debtors seek to remit the Deductions taken for prepetition wage obligations as they come due postpetition and to continue processing future Deductions in the ordinary course.

**b. Insurance, Disability, and Other Benefits**

58. Prior to the Petition Date, the Debtors offered (and continue to offer) Employees various standard employee benefits, including, without limitation, (a) medical, dental, and vision insurance, (b) life insurance, (c) disability insurance, (d) retirement savings plans, and (e) other miscellaneous Employee programs, provided to the workforce in the ordinary course of business (collectively, the "Benefits"), as described more fully below. The Debtors seek to pay any amounts incurred prepetition and owed postpetition, if any, for such Benefits and to continue paying such Benefit obligations as they arise postpetition in the ordinary course.

i. **Medical, Dental, and Vision Insurance.**

59. The Debtors offer health insurance coverage through Blue Cross Blue Shield of Texas ("BCBSTX") and Minimum Essential Coverage through the American Worker, dental

[10] The HealthWorX program is designed to provide these benefits at no net cost to the Employees while also generating payroll tax savings to the Debtors. HealthWorX is separate from the Debtors' traditional BCBSTX medical insurance plans and provides an additional benefit option for eligible Employees. Participants' pre-tax deductions are offset by a subsidy from a 501(c)(3) nonprofit paid on the same paycheck.

insurance coverage through BCBSTX, and vision insurance coverage through BCBSTX or EyeMed Network (collectively, the "Health Insurance"). In 2025, the Debtors paid approximately $1,963,400.00 for Health Insurance. The approximate total annual amount to be paid by the Debtors for Health Insurance in 2026 is approximately $2,085,239.00. The premiums are paid by the Debtors in advance on a monthly basis, and a portion of the premium is then deducted from Employee pay. As of the Petition Date, I believe that the Debtors owe approximately $41,303.95 on account of Health Insurance. The Debtors request authority, but not direction, to pay any amounts owing and to continue paying the Health Insurance, as applicable, in the ordinary course on a postpetition basis. Additionally, the Debtors pay certain administration costs for the Health Insurance through BCBSTX. The total amount paid for Health Insurance in 2026 is inclusive of these administration costs. The Debtors request authority to pay such administration costs and to continue to pay any of these costs in the ordinary course of business.

ii. **Retirement Savings**

60. The Debtors also provide a 401(k) retirement savings plan (the "401(k) Plan") to eligible Employees. The 401(k) Plan generally provides pre-tax and post-tax salary deductions of compensation up to limits set by the Internal Revenue Code, and Employee 401(k) contributions are deducted automatically from their respective wages. The Debtors typically match 40% of Employee contributions on the first 4% of pay. The 401(k) Plan is administered by the Debtors. All money contributed to the 401(k) Plan is held in a trust fund overseen by ADP Retirement Trust Services, LLC as trustee. Administration fees on account of the 401(k) Plan are paid monthly from the plan trust, not by the Debtors. Over the last six months, administration fees have averaged approximately $4,686.47 monthly. It is my understanding that no administration fees are owed by the Debtors as of the Petition Date.

61. The approximate annual cost of the 401(k) Plan program to the Debtors is $390,065.64. The Debtors have paid approximately $32,505.47 monthly in matching payments over the last year. As of the Petition Date, I estimate that the Debtors owe approximately $15,320.47 in employer matching contributions that have accrued but remain unpaid. The Debtors seek to continue paying retirement savings Benefits postpetition in the ordinary course.

iii. **Life, Accidental and Critical Illness, and Hospital Indemnity Insurance**

62. The Debtors provide life insurance and accidental, critical illness, and hospital indemnity insurance to all benefits-eligible Employees through Symetra (the "Other Benefits"). Symetra is paid monthly for these services. The Debtors paid Symetra approximately $14,637.05 for the month of September 2026, the majority of which is Employee-paid. As of the Petition Date, I estimate that the Debtors owe approximately $599.58 on account of the company-paid portion of the Other Benefits. The Debtors seek to pay such amount and continue such Other Benefits in the ordinary course postpetition.

iv. **Workers' Compensation**

63. In each state in which the Debtors operate, they maintain workers' compensation insurance for Employees at the statutorily required levels for claims arising from or related to their employment with the Debtors (collectively, the "Workers' Compensation Program," and any obligations thereto, the "Workers' Compensation Obligations"). The total cost of the current Workers' Compensation Program for the 2026–2027 policy period is $642,287.48. The Debtors pay the annual premium in quarterly installments in advance throughout the year. As of the Petition Date, I believe that the Debtors owe no accrued but unpaid prepetition amounts in respect of the Workers' Compensation Program.

64. The Debtors request authority to pay prepetition amounts owing with respect to the Workers' Compensation Obligations, and to continue honoring their obligations with respect to the Workers' Compensation Program in the ordinary course of business. It is critical that the Debtors be permitted to continue their Workers' Compensation Program and to pay outstanding prepetition claims, taxes, charges, assessments, premiums, and third-party administrator fees in the ordinary course of business because alternative arrangements for workers' compensation coverage would most certainly be more costly, and the failure to provide coverage may subject the Debtors and/or their officers to penalties.

v. **Other Miscellaneous Employee Programs**

65. The Debtors also offer Employees certain miscellaneous benefits (the "Miscellaneous Employee Programs"), including through health savings accounts with HSA Bank, flexible spending accounts with Wex Inc., and no-cost legal services with Rocket Lawyer. The Debtors do not contribute any amounts on account of the health savings accounts.

66. It is my understanding that the Debtors only owe amounts as of the Petition Date for the flexible spending accounts.[11] Therefore, as of the Petition Date, I believe the Debtors owe approximately $67.20 for the Miscellaneous Employee Programs. The Debtors seek to pay such amounts and seek to pay future amounts related to the Miscellaneous Employee Programs as they become due in the ordinary course throughout these chapter 11 cases.

[11] Rocket Lawyer is paid through an annual allocation of approximately $2,000.00 through the Debtors' management services agreement with non-Debtor Tasty Restaurant Group, LLC.

### *J. Debtors' Emergency Motion for Entry of an Order (I) Authorizing the Debtors to Maintain and Administer Their Existing Customer Programs and Honor Certain Prepetition Obligations Related Thereto and (II) Granting Related Relief* (the "Customer Programs Motion")

67. Through the Customer Programs Motion, the Debtors seek to maintain and administer their Customer Programs and honor certain prepetition obligations to customers in the ordinary course of business consistent with past practices.

### I. Customer Programs

68. The Debtors maintain a variety of programs to attract customers and continue positive customer relationships at each of their restaurants. Prior to the Petition Date, in the ordinary course of the Debtors' business and as is customary in their industry, the Debtors honored and engaged in certain customer and other programs and practices, most if not all of which are developed through KFC and/or the Yum! brands umbrella. These programs include customer gift card programs, reward programs, and related discounts (collectively, the "Customer Programs"). The Debtors' liability for the Customer Programs depends on consumer demand, marketing initiatives and promotions, and specific store performance at any given point in time. Due to such variables, it is difficult to quantify the Debtors' obligations attributable to the Customer Programs as a whole at a particular point in time.

69. It is my belief that to effectuate a smooth transition into chapter 11, the Debtors must maintain customer loyalty and goodwill by continuing to honor their obligations under the Customer Programs. The Debtors compete in highly competitive businesses and must regularly provide both existing and potential customers with programs similar to (or better than) those offered by their competitors. The Debtors maintain each of the Customer Programs in the ordinary course of their businesses as a means to promote positive, productive, and profitable relationships

with their customers that ultimately promote the KFC or Taco Bell brand and customer satisfaction, encourage new purchases, and ensure that the Debtors remain competitive.

70. It is my understanding that failure to continue the Customer Programs, or failure by the Debtors to meet their obligations under such programs, would damage the Debtors' reputation and relationship with their current and potential customers and could damage their relationships with their franchisors, KFC and Taco Bell, at this critical time in their operations. I believe that the success and viability of the Debtors' businesses, and ultimately the Debtors' ability to maximize the value of their assets, are dependent upon the continued patronage and loyalty of their customers. Any delay in honoring obligations to customers and third parties on account of the Customer Programs would severely and irreparably impair customer relations and drive away valuable customers, thereby harming the Debtors' efforts to maximize the value of their assets to the benefit of all interested parties.

## II. The Gift Card Program

71. The Debtors have agreements with Wolfe Merchant Solutions 2401, LLC ("Wolfe"), which govern a program pursuant to which their customers can purchase, and the Debtors redeem, restaurant gift cards (collectively, the "Gift Cards") in various denominations (the "Gift Card Program"). Under the Gift Card Program, Wolfe works with issuers to supply physical cards, digital cards, and card codes that customers can use at KFC locations. The Debtors are obligated to accept the Gift Cards at qualified locations, activate and redeem the Gift Cards, and collect funds on Wolfe's behalf for the issuer. The Debtors' agreements with Wolfe state that the issuer is the obligor on the Gift Cards, not the Debtors. The Debtors' role is to honor the Gift Cards, the value of which is then reimbursed through a settlement process between the parties.

72. Specifically, the Debtors honor the Gift Cards and are reimbursed through a daily true-up process. The Debtors pay all activation funds to the issuer, and the issuer owes the Debtors

the value of the Gift Cards redeemed each day at the stores, less any of Wolfe's fees. The Debtors deposit activation funds into a settlement account each day whereby Wolfe nets activation funds against redemption amounts and moves the difference to or from the Debtors' accounts based on that reconciliation process.

73. Once purchased, a Gift Card may be used like cash for purchases in the Debtors' restaurants. It is my understanding that because customers may choose where to spend the Gift Cards and could choose to spend them at one of several restaurant chains or other non-Debtor KFC or Taco Bell restaurants throughout the country, the exact value of the Gift Cards to the Debtors cannot be precisely calculated. However, I further understand that under the agreements with Wolfe and the settlement process, the Debtors historically have never had more than $1,000.00 outstanding (not yet settled) at any given time.

**III. The Rewards Programs**

74. The Debtors' restaurant locations are part of loyalty programs designed for frequent KFC customers (the "KFC Rewards Program") and Taco Bell customers (the "Taco Bell Rewards Program", and collectively with the KFC Rewards Program, the "Rewards Programs"). The KFC Rewards Program allows customers to earn points on every order and redeem those points for free food. The KFC Rewards Program also provides access to exclusive deals and discounts for its most loyal customers. Likewise, the Taco Bell Rewards Program provides frequent customers with points that can be redeemed for free food or exclusive offerings.

75. Points under the Rewards Programs are not redeemable for merchandise and only apply to discounts on food. At the time of redemption, the discount is applied at the restaurant's point of sale. The franchise restaurant bears the costs of that discounted item and is not reimbursed by the franchisor for redemption. The Rewards Programs increase sales, improve customer relationships, drive social media and website traffic, and generate return customers, all of which

inure to the benefit of the estates both in higher ticket sales per customer and stronger goodwill and customer loyalty.

### *K. Debtors' Emergency Motion for Entry of an Order (I) Authorizing (A) the Rejection of Certain Leases, (B) the Rejection of Certain Agreements, (C) the Abandonment of Certain Property, and (II) Granting Related Relief* (the "Rejection Motion")

76. The Debtors, in a good faith exercise of their business judgment, have determined to reject certain leases (or subleases) listed on Exhibit 1 to the proposed order (each, a "Lease" and collectively, the "Leases") because the costs of the Leases exceed any marginal benefits that could potentially be achieved from seeking assignments of such Leases. The Leases are at the Debtors' franchise locations—restaurants that are either not profitable, are no longer operating, or are in the process of winding down operations. For 2025, prior to the proposed rejection of the Leases, the Debtors incurred approximately $1,196,254.00 per month to lease their store locations. If rejection of the Leases as of the Petition Date is approved, the Debtors' monthly store rental obligations will be reduced to approximately $890,000.00. Given that the restaurants governed by these Leases are either already shut down prepetition or are winding down business and will no longer be operating postpetition, I do not believe there is any benefit to the Debtors' estates, creditors, or parties in interest in maintaining such Leases.

77. It is my understanding that, before the Petition Date, the Debtors notified each affected landlord in writing, by e-mail, or by telephone of their unequivocal and irrevocable decision to surrender the premises and property and turn over keys, key codes, and security codes, if any, to each affected landlord, providing the landlords with the opportunity to mitigate any rejection damages arising from the rejection of the applicable Lease.[12] The Rejection Motion shall

---

[12] For certain Leases, the Debtors installed a lockbox for the keys and provided access information to the affected landlords.

serve as further notice to reiterate the Debtors' immediate surrender of the premises pursuant to the terms of each Lease listed in Exhibit 1 to the proposed order, effective as of the Petition Date. Accordingly, to reduce postpetition administrative costs, and in the exercise of their sound business judgment, the Debtors have determined that rejecting the Leases, effective as of the Petition Date, is in the best interests of the Debtors, their estates, and their creditors.

78. I do not believe the Debtors own any valuable property remaining on the premises for the Leases to be rejected by this Rejection Motion. To the extent there is any personal property remaining on the premises, the Debtors seek to abandon such property.[13] The Debtors have determined that the subject property is of inconsequential value to the estates, or that the cost of removing and storing such property outweighs any potential benefit of retaining such property. Accordingly, to reduce postpetition administrative costs and, in the exercise of their sound business judgment, I believe that the abandonment of their property that may be located at each of the premises, if any, is appropriate and in the best interests of the Debtors, their estates, and their creditors.

79. Additionally, as explaine above, the Debtors are party to certain Franchise Agreements with the Yum! Parties. The Debtors have determined, in an exercise of their business judgment, to reject nine (9) Franchise Agreements listed on Exhibit 2 to the proposed order (collectively, the "Agreements"), each of which relates to a restaurant location subject to a Lease

[13] Notwithstanding the foregoing, the Debtors do not seek the immediate abandonment of equipment and other personal property owned, leased, or secured by certain secured parties which may still be located on the premises for some of the Leases, including (i) the cooking oil systems of Restaurant Technologies Inc.; (ii) any Pepsi machines; (iii) Airgas CO2 cylinders; and (iv) Brink's Capital LLC Smartsafes. Such parties are directed to review Paragraphs 8–9 of the proposed order regarding their rights to retrieve such property.

to be rejected by the Rejection Motion.[14] These restaurant locations either already shut down prepetition or are winding down business and will no longer be operating postpetition.

80. The Debtors have determined in a good-faith exercise of their business judgment to reject the Agreements as of the date of the Petition Date. I believe that the costs of the Agreements exceed any marginal benefits that could potentially be achieved otherwise. Accordingly, in an effort to reduce postpetition administrative costs, and in the exercise of their sound business judgment, the Debtors have determined that rejecting the Agreements, effective as of the date of the Petition Date, is in the best interests of the Debtors, their estates, and their creditors.

### *L. Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Continue to Operate Their Cash Management System and Honor Certain Prepetition Obligations Related Thereto, and (II) Granting Related Relief* **(the "Cash Management Motion")**

### I. The Cash Management System

81. As described in the Cash Management Schematic, in the ordinary course of business, the Debtors maintain an integrated, centralized cash management system (the "Cash Management System") comparable to the cash management systems used by similarly situated companies to manage the cash of the Debtors in a cost-effective, efficient manner. The Cash Management System is arranged to organize and monitor cash flows across the Debtors' enterprise, centralize payments for general administrative and operating expenses, and enable the Debtors to facilitate cash forecasting and reporting, monitor the collection and disbursement of funds, and maintain control over the administration of their bank accounts.

[14] As more fully set forth in the *Debtors' Emergency Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (IV) Modifying the Automatic Stay, (V) Scheduling Final Hearing, and (VI) Granting Related Relief* and proposed interim order, filed contemporaneously herewith, the rejection of these Agreements is a condition of borrowing.

82. The Debtors' Cash Management System includes a total of 140 bank accounts, consisting of four primary accounts, 135 restaurant-level accounts, and one segregated account for VRE Tasty 7 Pack, LLC (each, a "Bank Account," and collectively, the "Bank Accounts"). All but one of the Bank Accounts are held at Wells Fargo Bank, N.A. ("Wells Fargo"), and one Bank Account is held at American National Bank of Texas (together with Wells Fargo, the "Cash Management Banks"). The Debtors have recently closed or are in the process of closing several stores. Accordingly, the Debtors intend to close the bank accounts used by the restaurants being closed prior to, or during, these chapter 11 cases.

83. The Debtors use the funds in the Bank Accounts to pay most of the enterprise's operating expenses, including, among other things, (a) accounts payable, (b) employee benefits, (c) taxes, and (d) other operating expenditures in the ordinary course of the Debtors' business. As of the Petition Date, the Debtors have approximately $3,140,072.27 in cash in the Bank Accounts. The Debtors' trailing annual revenue as of September 2026 was approximately $194,317,680.00, and the gross cash receipts for the month ended September 30, 2026, were approximately $14,667,124.00. These amounts, however, vary month-to-month. The Bank Accounts are described in more detail below:[15]

[15] These descriptions of Bank Account types are for illustrative purposes only and are not exhaustive.

| Tasty Chick'n, LLC | |
|---|---|
| **Bank Account**[16] | **Bank Account Description** |
| Chicken Master Operating Account (ending 2888) (the "Operating Account") | Central operating hub held by Tasty Chick'n, LLC, used for payroll, ACH transfers, wires, and checks. All cash collected in the Chicken Master Store Depository Account is zero-balanced to the Operating Account, and the Operating Account funds the Chicken Vendor Disbursement Account and the Chicken Property Tax Disbursement Account through zero-balance transfers. The Operating Account participates in the Wells Fargo Stagecoach Sweep Program, an automated liquidity sweep whereby excess cash is automatically transferred out of the Operating Account and later redeposited through Stagecoach Sweep Credit transactions on a daily basis. |
| Chicken Master Store Depository Account (ending 2870) | Concentration account into which the store-level sub-accounts zero-balance their collections. All cash collected in this account is zero-balanced to the Operating Account. |
| Chicken Vendor Disbursement Account (ending 8745) | Disbursement account used to make vendor payments, funded from the Operating Account through zero-balance transfers. |
| Chicken Property Tax – Miscellaneous Disbursement Account (ending 8752) | Disbursement account used to pay property taxes and miscellaneous expenses, funded from the Operating Account through zero-balance transfers. |
| Store Sub Accounts (135 accounts, identified on **Exhibit A**) | Store-level sub accounts, each designated by store number, through which store receipts are collected by location. Each sub account operates as a zero balance account (ZBA) that sweeps to the Chicken Master Store Depository Account. |
| VRE Tasty 7 Pack, LLC Account (ending 6877) | Account for Debtor VRE Tasty 7 Pack, LLC with American National Bank of Texas. |

84. The Debtors pay fees incurred in connection with the Bank Accounts (the "Bank Fees") to the Cash Management Banks monthly in arrears. The Bank Fees average approximately $9,275 per month. As of the Petition Date, I believe the Debtors will owe approximately $9,275 in Bank Fees. The Debtors seek the authority, but not direction, to pay the prepetition Bank Fees and continue paying the Bank Fees in the ordinary course on a postpetition basis, consistent with historical practice.

## II. Corporate Card Program

85. In the ordinary course of business, the Debtors provide certain of their senior-level employees with CenterCard Corporate Credit Cards issued by Comdata, Inc., pursuant to a license

[16] The accounts ending in 2888, 2870, 8745 and 8752 are subject to a "Deposit Account and Sweep Investment Control Agreement" dated as of July 29, 2024, in favor of MidCap Financial Trust.

from Mastercard Inc. and paid through TRG under the MSA and such cards, collectively, the "Corporate Credit Cards"). Employees with access to a Corporate Credit Card may use the Corporate Credit Cards for a variety of necessary and reasonable corporate and operational expenses incurred within the scope of the employee's job duties, including operating supplies and services, transportation, meals, and store upkeep, among other things. The credit limits for the Corporate Credit Cards range from approximately $2,000 to $5,000.

86. As of the Petition Date, approximately 29 employees hold a Corporate Credit Card. Each Corporate Credit Card is held in the cardholder's individual name and paid by non-Debtor TRG directly in the ordinary course of business. The Debtors then reimburse TRG for their allocated cost pursuant to the terms of the MSA. This reimbursement process typically occurs on a weekly basis, amounting to approximately $150,000.00 per month owed by the Debtors to TRG on account of the Corporate Credit Cards under the MSA.

87. Continuing the Corporate Credit Cards is integral to the Debtors' Cash Management System. The employees' continued use of the Corporate Credit Cards for operational purposes, and the Debtors' ability to pay expenses incurred through the Corporate Credit Cards, are essential to the continued operation of the Debtors' business enterprise. As of the Petition Date, I believe that the Debtors may have approximately $150,000.00 outstanding and owed to TRG for payment on the Corporate Credit Cards. The Debtors seek authority to pay any amounts owed to TRG on account of the Corporate Credit Cards under the MSA, to continue such payments in the ordinary course of business under the MSA on a postpetition basis, consistent with historical practice, and to close existing or open new Corporate Credit Cards in the ordinary course pursuant to the terms of the orders granting this Cash Management Motion.

## III. Credit Card Processing Fees

88. In the ordinary course of business, the Debtors accept credit cards as payment for their food and services. In connection with processing customer credit card payments, the Debtors may incur and owe credit card processing fees to various third parties relating to the processing of such payments (the "Credit Card Processing Fees"). The ability to accept credit cards is integral to the Debtors' business and continued operations. As of the Petition Date, I estimate that the Debtors owe approximately $20,000 in Credit Card Processing Fees is outstanding. The Debtors seek authority to pay all amounts owed on account of the Credit Card Processing Fees and to continue paying such fees postpetition in the ordinary course of business, consistent with historical practice.

## IV. Intercompany Transactions

89. In the ordinary course of business through the Debtors' Cash Management System, the Debtors engage in transactions with each other (the "Intercompany Transactions"). Although certain vendor contracts or relationships may reside directly with Tasty Chick'n Southeast, LLC and Tasty Chick'n Midwest, LLC, Tasty Chick'n, LLC is the obligor under such relationships, makes the payments to such vendors, and reflects such payments on its books on a consolidated basis. Thus, by virtue of the sweeps made pursuant to the Cash Management System in the ordinary course of business, the Intercompany Transactions are reflected only on Tasty Chick'n, LLC's books, and there are no offsetting journal entries at the subsidiary level creating intercompany claims, as all transactions are recorded on a consolidated basis at the Tasty Chick'n, LLC level.

90. The Intercompany Transactions are an essential component of the Debtors' operations and centralized Cash Management System. Any disruption of the Intercompany

Transactions would severely disrupt the Debtors' operations and result in great harm to the Debtors' estates and their stakeholders. Accordingly, the Debtors seek authority to continue the Intercompany Transactions in the ordinary course of business on a postpetition basis, in a manner substantially consistent with the Debtors' past practice.

91. If the Debtors are not permitted to continue its existing Cash Management System, I am concerned about unnecessary delay and disruption to their business and personnel, including the risk that funds needed for the Debtors' business enterprise would be delayed if the Debtors were required to change the Cash Management System. The Debtors issue checks to vendors, service providers, employees, and others in the ordinary course of their business. Obtaining new accounts and checks will delay and disrupt the Debtors' ability to operate. The Debtors' Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtors including, among other things, the ability to control funds and reduce costs and administrative expenses by facilitating the movement of funds and the development of more timely and accurate account balance information.

92. I believe requiring the Debtors to adopt a new, segmented cash management system during these chapter 11 cases would be expensive, burdensome, and unnecessarily disruptive to the Debtors' operations. Importantly, the Cash Management System provides the Debtors with the ability to quickly track and report the location and amount of funds, which, in turn, allows management to track and control such funds, ensure cash availability, and reduce administrative costs through a centralized method of coordinating the collection and movement of funds. Any disruption of the Cash Management System would have a negative effect on the Debtors' restructuring efforts. Indeed, absent the relief requested herein, requiring the Debtors to adopt a new, segmented cash management system would cause the Debtors' operations to grind to a halt,

severely damaging the Debtors' business enterprise. By contrast, maintaining the current Cash Management System will facilitate the Debtors' transition into chapter 11 by, among other things, minimizing delays in paying postpetition debts and eliminating administrative inefficiencies. Finally, maintaining the current Cash Management System will allow the Debtors' accounting employees to focus on their daily responsibilities.

93. Accordingly, I believe that the Debtors have shown that a sound business purpose exists to continue use of the Cash Management System in the ordinary course postpetition and to authorize payment of prepetition amounts due in connection with the Cash Management System.